Slip Op. 12-39

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                                :
QINGDAO SEA-LINE TRADING CO.,   :
LTD.,                           :
                                :
              Plaintiff,        :
                                :
      v.                        :
                                :
UNITED STATES,                  :
                                : Before: Richard K. Eaton, Judge
              Defendant,        :
                                : Court No. 10-00304
      and                       :
                                :
FRESH GARLIC PRODUCERS          :
ASSOCIATION, CHRISTOPHER         :
RANCH, LLC, THE GARLIC CO.,     :
VALLEY GARLIC, and VESSEY AND   :
CO., INC.,                      :
                                :
              Def.-Ints.        :
_____:
```

OPINION AND ORDER

[Plaintiff's motion for judgment on the agency record is
granted, in part, and the Department of Commerce's Final Results
are remanded.]

Dated: March 21, 2012

*Hume & De Luca, PC* (*Robert T. Hume and Stephen M. De Luca*),
for plaintiff.

*Tony West*, Assistant Attorney General; *Jeanne E. Davidson*,
Director, *Reginald T. Blades, Jr.*, Assistant Director,
Commercial Litigation Branch, Civil Division, United States
Department of Justice (*Richard P. Schroeder*); Office of the
Chief Counsel for Import Administration, United States
Department of Commerce (*Ahran Kang McCloskey*), of counsel, for
defendant.

*Kelley Drye & Warren, LLP* (*Michael J. Coursey* and *John M. Herrmann*), for defendant-intervenors.

Eaton, Judge:  This matter is before the court on plaintiff Qingdao Sea-line Trading Co., Ltd.'s ("plaintiff" or "Sea-line") motion for judgment on the agency record, pursuant to USCIT Rule 56.2.  *See* Pl.'s Br. in Supp. of Mot. J. Agency R. ("Pl.'s Br.").  Defendant, the United States, and defendant-intervenors, the Fresh Garlic Producers Association, Christopher Ranch, LLC, The Garlic Company, Valley Garlic, and Vessey and Company, Inc. (collectively, "defendant-intervenors"), oppose the motion.  *See* Def.'s Mem. in Opp. to Pl.'s Mot. J. Agency R. ("Def.'s Br."); Def.-Ints.' Br. in Resp. to Pls.' Mot. J. Agency R. ("Def.-Ints.' Br.").

By its motion, plaintiff, an exporter of fresh garlic[1] from the People's Republic of China ("PRC"), challenges the Final Results of the United States Department of Commerce's ("Commerce" or the "Department") New Shipper Review in connection with the antidumping duty order on fresh garlic from the PRC for the period of review ("POR") November 1, 2008

---

[1]     Sea-line is an exporter of whole garlic bulbs, and is not itself a garlic grower.  It exports the whole garlic bulbs grown by Jinxiang County Juxingyuan Trading Co., Ltd. ("Juxingyuan").  *See* Pl.'s Br. 2; Def.'s Br. 20 n.9; Fresh Garlic from the PRC, 75 Fed. Reg. 61,130 (Dep't of Commerce Oct. 4, 2010) (notice of final results of new shipper review).

through April 30, 2009.  *See* Fresh Garlic from the PRC, 75 Fed.
Reg. 61,130 (Dep't of Commerce Oct. 4, 2010) (notice of final
results of new shipper review) ("Final Results"), and the
accompanying Issues and Decision Memorandum (Dep't of Commerce
Sept. 24, 2010) ("Issues & Dec. Mem."); Fresh Garlic from the
PRC, 59 Fed. Reg. 59,209 (Dep't of Commerce Nov. 16, 1994)
(antidumping duty order) (the "Order").  The court has
jurisdiction pursuant to 28 U.S.C. § 1581(c) (2006) and 19
U.S.C. § 1516a(a)(2)(B)(iii) (2006).

For the reasons set forth below, plaintiff's motion is
granted, in part, and the Final Results are remanded.


BACKGROUND

Following plaintiff's request, the Department initiated the
New Shipper Review under the Order on June 30, 2009.  *See* Fresh
Garlic from the PRC, 74 Fed. Reg. 31,241 (Dep't of Commerce June
30, 2009) (notice of initiation of new shipper review).
Commerce then published its Preliminary Results on May 5, 2010.
*See* Fresh Garlic from the PRC, 75 Fed. Reg. 24,578 (Dep't of
Commerce May 5, 2010) (notice of preliminary results of new
shipper review) ("Prelim. Results").  The contested Final
Results of the New Shipper Review, in which Commerce calculated
an antidumping duty rate of 155.33%, were published on October
4, 2010.

Case 1:10-cv-00304-RKE   Document 45   Filed 03/21/12   Page 4 of 48
Court No. 10-00304                                           Page 4

     Plaintiff's motion challenges two main aspects of the Final
Results.  First, Sea-line disputes (a) the Department's
selection of a surrogate to value whole garlic bulbs, and (b)
the inflator used to adjust the value of the garlic bulbs.
Second, plaintiff challenges the Department's choice of
financial statements used to calculate the surrogate financial
ratios.


                         STANDARD OF REVIEW

     "The court shall hold unlawful any determination, finding,
or conclusion found . . . to be unsupported by substantial
evidence on the record, or otherwise not in accordance with
law."  19 U.S.C. § 1516a(b)(1)(B)(i).


                            DISCUSSION

I. Surrogate Valuation of the Intermediate Input

     A. Legal Framework

          1. Calculation of Normal Value

     Under 19 U.S.C. § 1675(a)(2)(B), upon request, Commerce
shall conduct administrative reviews "for new exporters and
producers."  The purpose of these new shipper reviews is to
determine whether exporters or producers, whose sales have not
been previously examined, are (1) entitled to their own
antidumping duty rates under the order resulting from the

investigation, and (2) if so, to calculate those rates.  *See*

*Hebei New Donghua Amino Acid Co. v. United States*, 29 CIT 603,

604, 374 F. Supp. 2d 1333, 1335 (2005).  To calculate these

rates, Commerce must determine the normal value, export price,[2]

and the antidumping duty margin[3] for each entry of the subject

merchandise.  19 U.S.C. § 1675(a)(2)(A).

For merchandise exported from a nonmarket economy ("NME")

country,[4] such as the PRC, Commerce, under most circumstances,

determines normal value by pricing the factors of production

---

[2]      The "export price" is generally defined as "the price
at which the subject merchandise is first sold . . . by the
producer or exporter of the subject merchandise outside of the
United States to an unaffiliated purchaser in the United States
or to an unaffiliated purchaser for exportation to the United
States."  19 U.S.C. § 1677a(a).

[3]      An antidumping duty margin is "the amount by which the
normal price exceeds the export price or constructed export
price of the subject merchandise."  19 U.S.C. § 1677(35)(A).  If
the price of an item in the home market (normal value) is higher
than the price for the same item in the United States (export
price), the dumping margin comparison produces a positive
number, indicating that dumping has occurred.

[4]      A "nonmarket economy country" is "any foreign country
that [Commerce] determines does not operate on market principles
of cost or pricing structures, so that sales of merchandise in
such country do not reflect the fair value of the merchandise."
19 U.S.C. § 1677(18)(A).  "Because it deems China to be a
nonmarket economy country, Commerce generally considers
information on sales in China and financial information obtained
from Chinese producers to be unreliable for determining, under
19 U.S.C. § 1677b(a), the normal value of the subject
merchandise."  *Shanghai Foreign Trade Enters. Co. v. United
States*, 28 CIT 480, 481, 318 F. Supp. 2d 1339, 1341 (2004).

(the "FOPs") used to produce the merchandise by using surrogate data from "one or more market economy countries that are--(A) at a level of economic development comparable to that of the [NME] country, and (B) significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4)(A)-(B). Commerce then "add[s] an amount for general expenses and profit plus the cost of containers, coverings, and other expenses" to the surrogate FOP values. *Id.* § 1677b(c)(1). The Department calculates this amount using surrogate financial ratios. Here, because China is a NME country, Commerce, pursuant to 19 U.S.C. § 1677b(c)(1), selected India as the surrogate country for purposes of calculating normal value and to determine the financial ratios.

### 2. Intermediate Input Methodology

Following the Ninth Administrative Review, Commerce ceased using its regular method of tallying the FOPs as valued in a surrogate country to calculate normal value for garlic exported from the PRC. Commerce changed its methodology because of, what it found to be, vagaries and inconsistencies in the reporting of the FOPs for garlic farming in China. Commerce found the FOP data to be problematic because of environmental conditions, the long growing season for garlic, the unique land leasing arrangements, and the lack of adequate books and records allowing the Department to establish the accuracy of the

reported FOPs.  *See Jining Yongjia Trade Co. v. United States*, 34 CIT __, __, Slip Op. 10-134 at 8-11 (Dec. 16, 2010) (not reported in the Federal Supplement).

As a result, beginning with the Tenth Administrative Review,[5] the Department determined that, "[i]n order to eliminate the distortions in our calculation of [normal value] . . . , we have applied an intermediate-product valuation methodology to all companies," and endeavored to capture the complete costs of producing "fresh garlic" by valuing the "fresh garlic bulb" as an intermediate product.  *See* Fresh Garlic from the PRC, 71 Fed. Reg. 26,329, 26,331 (Dep't of Commerce May 4, 2006) (final results and partial rescission of antidumping duty administrative reviews and final results of new shipper reviews).  In other words, rather than basing normal value on the sum of the surrogate values for the upstream FOPs reported by respondents, Commerce assumed that these costs were all contained in the price of the intermediate product, the whole garlic bulb itself.  *See Jining Yongjia*, 34 CIT at __, Slip Op.

---

[5]      The Tenth Administrative Review for garlic was not the first time that the Department used an intermediate input methodology; rather, it had previously been used in the *Certain Frozen Fish Fillets* less-than-fair-value determination.  *See* Certain Frozen Fish Fillets from the Socialist Republic of Vietnam, 68 Fed. Reg. 4986, 4993 (Dep't of Commerce Jan. 31, 2003) (notice of preliminary determination of sales at less than fair value).

10-134 at 11.  No party objects to the methodology employing the
whole garlic bulb as an intermediate input in this New Shipper
Review.

Pursuant to statute, the information used by Commerce to
value the FOPs (here, the whole garlic bulbs) must be the "best
available information regarding the values of such factors in a
market economy country or countries considered to be
appropriate."  19 U.S.C. § 1677b(c)(1).  In selecting the best
available information for valuing the FOPs, Commerce's practice
is to select surrogate values that "reflect[] a broad market
average, [are] publicly available, contemporaneous with the
period of review, specific to the input in question, and
exclusive of taxes on exports."  *QVD Food Co. v. United States*,
34 CIT __, __, 721 F. Supp. 2d 1311, 1315 (2010).


B. The Garlic Bulb Valuation

Plaintiff first takes issue with the Department's selection
of a non-contemporaneous surrogate value for the garlic bulbs.
Using the intermediate input methodology, Commerce selected a
surrogate value for whole garlic bulbs (the "intermediate
input") derived from information in the Azadpur Agricultural
Produce Marketing Committee's Market Information Bulletin ("APMC
Bulletin").

Because plaintiff reported a garlic bulb input size of over 55 millimeters, Commerce determined that it was "Grade Super A."[6] As there were no Grade Super A prices reported in the APMC Bulletin for the POR of November 1, 2008 through April 30, 2009, Commerce used the Grade Super A prices for the preceding period of November 1, 2007 through February 6, 2008.  The Department stated that it chose the earlier data because it considered garlic bulb size to be the most important criteria in valuing the garlic bulbs, overriding other factors, including contemporaneousness.  Def.'s Br. 11 ("'The vast majority of evidence indicates that size of the garlic bulbs is given significant value in the marketplace.'" (citation omitted)). The Department then adjusted these prices for inflation using a wholesale price index for India published by the International Monetary Fund (the "IMF Index").  Using this approach, Commerce calculated a Grade Super A garlic surrogate value of 54.9902 rupees per kilogram.[7]

---

[6]     "Grade Super A" refers to garlic bulbs of 55 millimeters or more.  It is undisputed that all of Sea-line's exports under review are within the Super A range.  Pl.'s Br. 10; Def.'s Br. 4.

[7]     This final value reflects a clerical correction from the Preliminary Results; Commerce subtracted seven percent in market fees from the average Super A value in the APMC Bulletin.

For plaintiff, however, the "best available information" to value the whole garlic bulb would have been the published APMC Bulletin prices for Grade A garlic (one size smaller than Grade Super A) during the POR itself.  Pl.'s Br. 18 ("The Department's selection of non-contemporaneous information for the surrogate value of garlic bulbs deviates from the Department's normal practice of using contemporaneous information for selecting surrogate values.  The data used by the Department was more than a year earlier than the [POR] and as a result of using non-contemporaneous information, the surrogate value for [the] garlic bulb was heavily skewed." (internal citation omitted)).  Thus, while plaintiff appears to argue that contemporaneity must trump product-specificity, defendant urges that it reasonably concluded that size specificity for garlic was the more important factor.  Def.'s Br. 10–13.

Although it may be that size is a more important factor than contemporaneity when valuing the whole garlic bulb, here Commerce's decision to use the earlier grade-specific data, rather than the contemporaneous data for a smaller garlic bulb, was not adequately explained.  The Department determined that the "best available information" was that which most closely reflected the garlic size actually exported by plaintiff, even though the prices were for garlic sold outside of the POR.  Commerce states that "garlic size is an important price factor,"

and therefore prices for Super A grade garlic are more "product-specific" to the garlic exported by Sea-line, in comparison to the contemporaneous garlic prices available for the smaller garlic size.  Issues & Dec. Mem. at 6, 5.

Although it states that the "vast majority of evidence" supports the importance of garlic size, Def.'s Br. 11, the Department does not address this evidence, and has not explained why garlic bulb size is such an important factor that Commerce was justified in using prices outside of the POR.  Rather, the Department has simply relied upon its conclusion that size was the most significant criterion when valuing the input, without further explanation.  Issues & Dec. Mem. at 6. ("[T]he Department has determined that the size-specific garlic prices available from the Azadpur APMC are preferable because garlic size is an important price factor.").  As a result, Commerce has failed to explain why garlic size (product-specificity) trumps contemporaneousness in its choice of garlic bulb prices, even though such an explanation is required under these circumstances.  *See Allegheny Ludlum Corp. v. United States*, 29 CIT 157, 168, 358 F. Supp. 2d 1334, 1344 (2005) (Commerce "must explain its rationale . . . such that a court may follow and review its line of analysis, its reasonable assumptions, and other relevant considerations.").

In light of the foregoing, the court holds that Commerce's determination that the APMC Bulletin prices from a prior POR for Super A grade garlic were the "best available information" was not supported by substantial evidence.  Therefore, this determination is remanded.

C. Price Adjustment

While preserving its argument that Commerce should have used prices from the POR, plaintiff also objects to the use of the IMF Index to adjust the surrogate garlic bulb prices from the 2007–2008 APMC Bulletin to an appropriate price during the POR.  According to plaintiff, should the Department be permitted to use prices outside of the POR, these prices should not be adjusted by using the IMF Index because it does not account for garlic price decreases that occurred in 2008.  Therefore, plaintiff insists that either of the two alternative methods it proposes for adjusting the price of the garlic bulb would have yielded more accurate values.  *See* Pl.'s Br. 22 ("Either method takes into account the garlic specific price changes between the 07/08 period and the 08/09 period.  The Department's methodology simply failed to reflect garlic specific price changes during a time of a world economic recession."); *see also* Case Br. from Resp. to Sec. of Commerce 4, A-570-831 (June 4, 2010) (P.R. Doc. 62) ("Pl.'s First Case Br."); Case Br. from Resp. to Sec. of

Commerce 9, A-570-831 (August 6, 2010) (P.R. Doc. 67) ("Pl.'s
Second Case Br.") ("The prices during the POR were dramatically
lower than the corresponding period in 2007–2008.").  Commerce,
however, provides two reasons to support its use of the IMF
Index for India.  Issues & Dec. Mem. at 8–9.


       1. Routine Use of a Single, Country-Wide Index

     First, Commerce states that, for the purposes of adjusting
prices, "it is the Department's practice to use a single,
country-wide [wholesale price index]."  Issues & Dec. Mem. at 8.
Indeed, a single, country-wide wholesale price index was used in
the Twelfth and Thirteenth Administrative Reviews of fresh
garlic.  Issues & Dec. Mem. at 8 ("[I]n prior reviews of fresh
garlic, [Commerce] ha[s] also used the same [wholesale price
index] methodology utilized in the instant case."); see also
Def.'s Br. 7 ("Commerce . . . found that using a single country-
wide wholesale price index was consistent with its practice . .
. .").  With this history in mind, Commerce found "no reason to
deviate from its established practice," and believes that it
properly "exercised its discretion by using an 'all commodities'
wholesale price index for India."  Issues & Dec. Mem. at 9;
Def's Br. 15.

     Commerce's reliance on its past "routine practice" of using
a single, country-wide wholesale price index standing alone,

however, does not adequately support its determination.  Indeed,
Commerce must do more than simply state that its conclusions are
justified because they are in accord with actions in prior
reviews; rather, it must "cogently explain why it has exercised
its discretion in a given manner."  *Motor Vehicle Mfrs. Ass'n v.
State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983).
Therefore, were reliance on past practice its sole reason for
determining that the IMF Index was the best available
information, the court would find its explanation wanting.
Here, however, the defendant has provided additional support for
its use of the IMF Index through its second argument, which the
court finds convincing.

> ### 2. Plaintiff's Two Alternative Methodologies Are Not
> ### Supported by Substantial Evidence

Commerce's second argument is that the record lacks
substantial evidence to support Sea-line's contention that
either of the two alternative methods it proposes for adjusting
the garlic bulb prices "would yield a more accurate adjustment
to the garlic surrogate value than the method the Department
used."  Issues & Dec. Mem. at 8.  With respect to its two
proposed methodologies, plaintiff argues that Commerce should
either have: (1) used the Grade Super A prices from the older
2007-2008 APMC Bulletin and adjusted them for inflation or

deflation using the wholesale price index supplied by plaintiff,
which was purportedly based upon data published by India's
Ministry of Commerce and Industry, resulting in a surrogate
value of 28.64 rupees per kilogram; or (2) calculated the ratio
between the prices for Grades Super A and A garlic in the older
2007-2008 APMC Bulletin, and applied this ratio to the
contemporaneous Grade A price to extrapolate a Grade Super A
price for the POR, resulting in a surrogate value of 19.90
rupees per kilogram.  Pl.'s Br. 15-16.

### a. Plaintiff's Indian Wholesale Price Index

As to its first proposed method, Sea-line maintains that
the prices should have been adjusted using data it claimed,
during the administrative proceedings, were published by India's
Ministry of Commerce and Industry.  According to plaintiff, this
data included garlic-specific prices, whereas the IMF Index was
comprised of a "'mixture of prices of agricultural and
industrial goods.'"  Pl.'s Br. 20 (citation omitted).

Commerce insists, however, that plaintiff's proffered index
was not a publicly-available index published by the Indian
Ministry of Commerce.  *See Allied Pac. Food (Dalian) Co. v.
United States*, 30 CIT 736, 760, 435 F. Supp. 2d 1295, 1316
(2006) ("The regulations, in 19 C.F.R. § 351.408, provide that
Commerce 'normally will use publicly available information to

value factors.'"").  Rather, Commerce asserts that the index was
"created" by plaintiff based upon information that Sea-line
stated it had sourced from the website of India's Ministry of
Commerce and Industry.  Def.'s Br. 16.  Further, according to
Commerce, "Sea-line . . . provided no information with respect
to the government of India garlic price data which presumably
underpins the garlic [wholesale price index] it calculated."
Issues & Dec. Mem. at 8.

    Sea-line submitted its index in its rebuttal to defendant-
intervenors' submission of surrogate value data during the
administrative proceedings, and subsequently reproduced the
index in its administrative case briefs.  Pl.'s First Case Br.
7; Pl.'s Second Case Br. 12.  To support its submission, Sea-
line provided, what turned out to be, an erroneous website
address as the source of the data, and "provided no explanation
or context for the data itself, that is, for how the government
of India compiled the relevant data."  Def.'s Br. 16.  According
to defendant, during the administrative proceedings it was
determined that the website provided by plaintiff did not
contain the data from which the index was compiled.  Pl.'s Reply
to Def. & Def.-Ints.' Br. 8 ("Pl.'s Reply); Def.'s Br. 16.
Rather, the data used in plaintiff's index was later determined

to have been derived from the website for the Office of the
Economic Adviser to the Government of India,[8] as indicated by
plaintiff's subsequent briefing in this action.  Pl.'s Br. 22.
The correct source of the data, though, was never presented to
the Department during the administrative proceedings.  Because
Commerce was unable to verify the index, it claims that the
index was reasonably rejected.  Def.'s Br. 16.

While acknowledging that its "surrogate value data . . .
contain[ed] an error," the plaintiff argues in its papers that
"[i]f the Department questioned the validity of the garlic
index, the [D]epartment had the time and resources to assess the
garlic index."  Pl.'s Reply 8; Pl.'s Br. 21.  In like manner, at
oral argument, plaintiff asked the court to find that Commerce
had an affirmative duty to seek clarification or correction of
the deficient filing, and asserted that the burden to create an
adequate record lies with Commerce.  *See also* Pl.'s Br. 21.
According to plaintiff,

> [d]efendant does not cite to the record where these
> deficiencies are noted and we are unaware of the
> record evidence that Commerce ever notified Sea-line
> of any deficiencies or errors in its submissions(s)
> with respect to these claims.  Nevertheless, Commerce
> had a responsibility to calculate the margins as
> accurately as possible.  Commerce has the authority to
> ask parties to answer questions at any time and to

---

[8]     The website is located at http://www.eaindustry.nic.
in.

> extend deadlines.  It is unclear how Commerce can
> justify rejecting surrogate value data that contains
> an error without allowing the party to respond.

Pl.'s Reply 8.  To support this contention, plaintiff cites

Commerce's regulation pertaining to "[e]xtension of time limits"

in antidumping reviews.  19 C.F.R. § 351.302(b) (2011) ("Unless

expressly precluded by statute, [Commerce] may, for good cause,

extend any time limit established by this part.").

Defendant counters that "Commerce explicitly addressed the

garlic index [in the final results] and found that it lacked

'information with respect to the government of India garlic

price data which presumably underpins the garlic [wholesale

price index Sea-line] calculated.'"  Def.'s Br. 17 (quoting

Issues & Dec. Mem. at 8).  Further, defendant argues that "Sea-

line's statement [concerning Commerce's duties with respect to

the record] reflects a misunderstanding of the evidentiary

burden that underlies Commerce's administrative proceedings."

Def.'s Br. 17.

The court agrees with Commerce that Sea-line appears to

misunderstand its role in these proceedings.  As defendant

points out, and as the Federal Circuit has recently reiterated,

"[a]lthough Commerce has authority to place documents in the

administrative record that it deems relevant, 'the burden of

creating an adequate record lies with [respondents] and not with

Commerce.'"  *QVD Food Co. v. United States*, 658 F.3d 1318, 1324

(Fed. Cir. 2011) (quoting *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 16 CIT 931, 936, 806 F. Supp. 1008, 1015 (1992)); *see also Wash. Int'l Ins. Co. v. United States*, 33 CIT ___, Slip Op No. 09-00078 at 11 n.12 (July 29, 2009) (not reported in the Federal Supplement) ("It is the interested party to an administrative review who bears the burden of production on its claim."); *Chia Far Indus. Factory Co. v. United States*, 28 CIT 1336, 1354, 343 F. Supp. 2d 1344, 1362 (2004) ("Ultimately, the burden of creating an adequate record lies with the respondents, not Commerce."). It is particularly the duty of a party to complete the record when, as here, plaintiff is proffering data that it claims is the "best available information." Therefore, under the circumstances, it was simply not Commerce's duty to help Sea-line create an adequate record to support its position.[9]

---

[9]     While the parties do not discuss it, there is a provision in the antidumping statute pertaining to "deficient submissions." *See* 19 U.S.C. § 1677m(d). This section states that if Commerce "determines that a response to a request for information under this title does not comply with the request, [Commerce] . . . shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency." *Id.* This provision, however, appears to be limited to cases involving "facts otherwise available" in the context of deficient responses to Commerce's questionnaires during antidumping investigations and reviews. As such, the "deficient submissions" requirement extends to submissions where the respondent is supplying information about its own company "in response to [Commerce's] request," which is distinguishable from surrogate valuation

( continued . . . )

Thus, because the Department could not verify the accuracy of plaintiff's proffered index during its administrative proceedings, the court finds that Commerce reasonably concluded that plaintiff's contention that the index it created itself constitutes the "best available information," and that its use would yield a more accurate result, was not supported by substantial evidence.

### b. Plaintiff's Ratio Methodology

In addition to its proposed index, Sea-line argues, in the alternative, that Commerce should have used the prices for Grade A garlic from the APMC Bulletin contemporaneous to the POR, as adjusted by using the ratio between Grade Super A and Grade A garlic from the older APMC Bulletin.  To support the soundness of this methodology, plaintiff "presumes" that "the price relationship between Super-A grade and A grade prices remain 'relatively constant.'"  Pl.'s Br. 23; see also Pl.'s First Case Br. 10; Pl.'s Second Case Br. 14–15 ("We can presume that [the Grade Super A/Grade A] ratio is relatively constant.  Therefore, we can use the [Grade Super A/Grade A] ratio we know from the

---

( . . . continued )

proceedings where, as here, a respondent voluntarily proposes surrogate value data for Commerce's consideration.

[2007-2008] APMC Bulletin . . . to derive [a Grade Super A]
value during the POR.").

Defendant maintains, however, that plaintiff's proposed
ratio methodology was properly rejected because there was
insufficient evidence on the record to support the claimed
constant ratio between the two grades.  Def.'s Br. 17-18; *see
also* Issues & Dec. Mem. at 9 ("[T]here is insufficient
historical Azadpur APMC price data (Super-A grade and A grade)
on the record of this review to serve as the basis for a
meaningful price ratio.").  Put another way, Commerce argues
that one year's data on the price difference between the
different grades of garlic bulbs was not sufficient to establish
that the ratio would be consistent over time.

As with its arguments with respect to the Indian wholesale
price index, however, plaintiff maintains that, if the
Department found its submissions wanting, it was the duty of
Commerce to seek clarification from plaintiff, and that the
burden to create an adequate record lies with Commerce "which is
responsible for conducting the review."  Pl.'s Br. 23.
Specifically, plaintiff states that "[i]t is unclear when or
even if Sea-line was provided an opportunity to present . . .
'historical data' [establishing the ratio over time] and why the
Department, which is responsible for conducting the review and
frequently supplies the data, failed to check."  Pl.'s Br. 23.

Defendant counters that "[o]nce again, Sea-line fails to
recognize that respondents bear the burden of building a record
adequate to support their arguments."  Def.'s Br. 19.
Furthermore, according to defendant, "Sea-line had the
opportunity [to] present historical data in its rebuttal to
[defendant-intervenor's] surrogate value comments.  Its failure
to do so left Commerce with no factual basis for adopting Sea-
line's alternative proposal."[10]  Def.'s Br. 19.  Therefore,
"because the reliability of Sea-line's [ratio] method could not
be confirmed, Commerce acted within its discretion in rejecting
it."  Def.'s Br. 18

The court finds Sea-line's arguments regarding its
evidentiary burden unpersuasive.  That is, as discussed above,
under circumstances such as these, it was not Commerce's duty to
help Sea-line create an adequate record to support its position
that the application of its proposed ratio would result in the
"best available information."  *See Chia Far Indus. Factory*, 28
CIT at 1354, 343 F. Supp. 2d at 1362 ("Ultimately, the burden of
creating an adequate record lies with the respondents, not
Commerce.").

---

[10]     According to 19 C.F.R. § 351.301(c)(1), "[a]ny
interested party may submit factual information to rebut,
clarify, or correct factual information submitted by any other
interested party at any time prior to the deadline . . . for
submission of such factual information."

The court also finds that, in the absence of evidence to support the accuracy of plaintiff's ratio methodology over time, Commerce reasonably concluded that the use of the proposed ratio was not supported by substantial evidence, and that the method was not the "best available information" on the record. That is, because plaintiff provided no evidence tending to establish that the ratio it proposed had been constant over a period of years, it was not established that using the ratio would result in a more accurate adjustment to the older garlic bulb prices than the method used by Commerce. *Anshan Iron & Steel Co. v. United States*, 28 CIT 1728, 1735, 358 F. Supp. 2d 1236, 1242 (2004) ("Commerce is generally at liberty to discard one methodology in favor of another where necessary to calculate a more accurate dumping margin . . . .").

Finally, the court holds that Commerce's determination that the IMF Index constituted the "best available information" on the record was reasonable and supported by substantial evidence. First, as has been seen, plaintiff failed to demonstrate that its two alternatives proposed were the "best available information" on the record. Second, the use of the IMF Index to adjust the garlic bulb prices comports with the Department's preference, to which plaintiff does not object and which appears to be reasonable in this case, "to use, where possible, . . . publicly available [data] which is (1) an average non-export

value; (2) representative of a range of prices within the . . .

POR; (3) product-specific; and (4) duty and tax-exclusive."

Issues & Dec. Mem. at 5.  Therefore, Commerce's use of the IMF

Index is sustained.


II. Surrogate Financial Ratios

    A. Legal Framework for Surrogate Financial Ratios

    As noted, to calculate the normal value for merchandise

from a NME country, Commerce values the FOPs used to produce

"identical or comparable merchandise in the surrogate country."

19 C.F.R. § 351.408(c)(4).  Here, the Department has determined

that the upstream FOP values are captured in the intermediate

product—the whole garlic bulb.  This surrogate value, however,

does not take into account the "'general expenses and profits'

not traceable to a specific product." *Dorbest Ltd. v. United*

*States*, 30 CIT 1671, 1715, 462 F. Supp. 2d 1262, 1300 (2006),

*aff'd in part, vacated in part on other grounds* (citing 19

U.S.C. § 1677b(c)(1)).  Therefore,

> in order to capture these expenses and profits,
> Commerce must factor (1) factory overhead
> ("overhead"), (2) selling, general and administrative
> expenses ("SG&A"), and (3) profit into the calculation
> of normal value.  As with its calculation of the other
> factors of production, Commerce uses surrogate values
> to determine an importer's financial ratios.

*Id.* at 1715, 462 F. Supp. 2d at 1300 (citations omitted).

The "surrogate financial ratios"[11] are then added to the

surrogate values of the FOPs (or, as here, the value of the

whole garlic bulb as the intermediate input).  19 U.S.C. §

---

[11]    These "surrogate financial ratios" are calculated as
follows:

> Factory overhead includes such costs as the cost of
> machinery, spare parts, and rent.  Commerce adds
> together all such costs, as expressed on a surrogate
> company's financial statement, to get the total
> overhead expenditure ("$Overhead_s$"); Commerce then
> divides the result by the surrogate firm's material,
> labor, and energy costs ("$MLE_s$").  Finally, Commerce
> multiplies the result by the derived manufacturing
> cost of the product in question of the investigated
> firm ("$MLE_p$").  The result is the overhead that may be
> allocated to the normal value of the merchandise in
> question ("$Overhead_p$"). . . .

> Next, Commerce adds the surrogate firm's MLE and
> Overhead (together "the cost of manufacturing") and
> determines an amount for general expenses ("$SG\&A_s$")
> including, for example, expenses such as bank charges,
> travel expenses, and office supplies.  Commerce then
> calculates the ratios of the surrogate firms' SG&A to
> its cost of manufacturing and multiplies this ratio by
> the sum of $MLE_p$ and $Overhead_p$; the result is the SG&A
> that may be allocated to the merchandise in question
> ("$SG\&A_p$"). . . .

> Last, Commerce adds an amount for profit.  Commerce
> initially calculates the surrogate company's profit
> ratio which is the ratio of the surrogate company's
> before-tax profit ("$profit_s$") over the sum of $MLE_s$,
> $Overhead_s$, and $SG\&A_s$.  Commerce then multiplies this
> result by the investigated company's derived $MLE_p$,
> $Overhead_p$, and $SG\&A_p$. The result is the profit that may
> be allocated to the merchandise in question
> ("$profit_p$").

*Dorbest*, 30 CIT at 1715–16 n.36, 462 F. Supp. 2d at 1301 n.36
(citations omitted).

1677b(c)(1)(B) (Commerce "shall determine the normal value of

the subject merchandise on the basis of the value of the factors

of production utilized in producing the merchandise and *to which*

*shall be added an amount for general expenses and profit*."

(emphasis added)).

The surrogate values used to calculate the ratios are

derived from surrogate financial statements.  In selecting these

statements, Commerce "normally will use nonproprietary

information gathered from producers of identical or comparable

merchandise in the surrogate country."  19 C.F.R. §

351.408(c)(4).  In doing so, Commerce "narrow[s] the list of

financial statements meeting this criterion by consider[ing] the

quality and specificity of the statements, as well as whether

the statements are contemporaneous with the data used to

calculate production factors."  *Dorbest Ltd. v. United States*,

604 F.3d 1363, 1374 (Fed. Cir. 2010).  In addition, "Commerce

[has] explained that its preference is 'to use multiple

financial statements in order to eliminate potential distortions

that may arise from using those of a single producer,' as long

as those financial statements 'are not distortive or otherwise

unreliable.'"  *Dorbest*, 604 F.3d at 1374, 1368 ("Generally, if

more than one producer's financial statements are available,

Commerce averages the financial ratios derived from all the

available financial statements."); *see also* 19 C.F.R. §

351.408(c)(4) (noting, in the plural, that Commerce "normally

will use non-proprietary information gathered from *producers* of

identical or comparable merchandise in the surrogate country")

(emphasis added).


        B. The Financial Statements

        In this case, during the administrative proceedings

defendant-intervenors submitted financial statements from two

Indian companies, ADF Foods and Tata Tea, for use in calculating

the surrogate financial ratios.  Plaintiff submitted statements

for four companies, including Garlico Industries Limited

("Garlico") and Limtex Tea Limited ("Limtex"), for the same

purpose.  In making its final determination, the Department

chose to average the data from Tata Tea's and Limtex's

statements to arrive at the surrogate financial ratios.

        Defendant states that Commerce's use of the Tata Tea and

Limtex financial data was reasonable because, in accordance with

accepted financial ratio standards, "they were contemporaneous

[and] publicly available."  Def.'s Br. 21.  Further, these

financial statements "reflected tea production," Def.'s Br. 21,

and "[s]ince the 2002-2003 administrative review [for garlic],

the Department has considered tea processing to be sufficiently

similar to garlic processing."  Issues & Dec. Mem. at 12.

Therefore, Commerce has relied upon the financial statements of

tea producers and exporters since that review.  No party objects

to the use of surrogate financial statements from tea companies

to determine the surrogate financial ratios in this case.

Indeed, both the plaintiff and defendant-intervenors submitted

financial statements from Indian tea companies for Commerce's

consideration, and Sea-line "conced[ed] tea financials can be

appropriate."  Pl.'s Br. 16.


### 1. Use of the Tata Tea Statement

Notwithstanding its concession that tea financials are

appropriate for valuing garlic production, plaintiff argues

that: (1) the Tata Tea statement does not reflect Sea-line's

production process because: (a) it includes financial

information from non-tea and non-garlic businesses, and (b) the

financial statements reflect the processing of peeled garlic

instead of whole garlic; (2) the Tata Tea financial statement

consolidated information from countries other than India; and

(3) the Department could have used a smaller subset of the Tata

Tea data to more accurately represent garlic-related expenses

and profits.  Pl.'s Br. 16-17.

### a. Financial Data Does Not Reflect Sea-Line's Production Process

Sea-line's first argument is that the Tata Tea financials were not appropriate "because they included substantial information for non-tea production." Pl.'s Reply 10. According to plaintiff, "[t]he products the Tata Tea Group [produces] range from tea to [c]offee, pepper, cardamom, sp[i]c[e]s & others, timber, veneer/plywood and mineral water. Among these products, the sale of coffee in the Tata Tea Group accounts [for] 20.88% of the sales and services." Pl.'s Second Case Br. 18-19. In connection with this argument, plaintiff states that Commerce had previously found that "coffee is not a comparable product [to] garlic." Pl.'s Second Case Br. 19.

While the Department acknowledges that Tata Tea's financial statement includes commodities other than tea, most significantly coffee, it argues that "sales of tea comprise the vast majority of Tata Tea Group's sales," while the other commodities listed by plaintiff (other than coffee) comprise an insignificant fraction of sales. Issues & Dec. Mem. at 13. For this reason, defendant maintains that "Commerce fulfilled its obligation [to chose the best available information] by acknowledging that tea did not account for 100 percent of Tata Tea's sales but finding that it still represented the 'vast majority' of Tata Tea's activity." Def.'s Br. 26. Therefore,

defendant contends that "Sea-line has failed to demonstrate that
Tata Tea's consolidated financial statements were not reasonably
reflective of tea production."  Def.'s Br. 25.

As to plaintiff's claim that Commerce has found that coffee
production is not equivalent to tea production, Commerce grants
that it had previously found "'that the coffee industry is not
as comparable with the operations of the respondent garlic
companies as the tea industry. . . . [Therefore,] the coffee
industry in India does not represent as accurate a surrogate for
garlic production as does the tea industry.'"  Issues & Dec.
Mem. at 11 (citation omitted).  Commerce goes on to argue,
however, that "as conceded by Qingdao Sea-line, sales of tea
comprise the vast majority of Tata Tea Group's sales, with sales
of coffee representing less than one quarter of total sales."
Issues & Dec. Mem. at 12-13.  Thus, for Commerce, even though
coffee production is not "as comparable" to garlic production as
is tea production, Tata Tea's financials remain the best
available information on the record, particularly when averaged
with Limtex's financial information, because the great majority
of Tata Tea's financials reflect tea production.

At bottom, Commerce's argument is that, while not
reflecting costs related to the production of tea alone, the
inclusion of Tata Tea's financial information in the average
used to calculate the financial ratios, rather than relying

solely on Limtex's alone, produced a more reliable result.  *See*

Def.'s Br. 28 ("Commerce acted within its discretion in

following its well-established practice to use information from

more than one surrogate producer to better represent the

surrogate industry.").

Additionally, Commerce made the specific finding that the

production processes used by Limtex and Tata Tea were similar to

those of Sea-line's producer, Juxingyuan, and therefore the

choice to use both surrogate companies was supported by

substantial evidence.  The Department explained that

> we are using Tata Tea's and Limtex's financial data,
> since tea is comparable to subject merchandise (*i.e.,*
> whole and peeled garlic) and each company's non-
> integrated production process [i.e., they purchase
> rather than grow their raw material inputs] is similar
> to [Sea-line's producer] Juxingyuan.  We find that the
> resulting financial ratios from the average of Tata
> Tea's and Limtex's financial data provide the best
> surrogate for the garlic industry in the PRC as a
> whole, based on the information on the record of this
> review.

Prelim. Results, 75 Fed. Reg. at 24,582 (unchanged in Final

Results); *see also* Def.'s Br. 21.  In other words, because

Commerce determined that Tata Tea, Limtex, and Sea-line's

producer Juxingyuan all purchased their raw material inputs,

rather than growing them themselves, the statements from these

companies were the "best available information" on the record.

Next, plaintiff claims that the Tata Tea financial

statement is representative of peeled garlic production, and not

the production of the whole garlic bulbs that Sea-line actually
exported to the United States.  Therefore, according to
plaintiff, "the Department selected . . . financial information
which does not reflect Sea-line's production processes [because]
Sea-line's sale concerns whole garlic rather than peeled
garlic."  Pl.'s Br. 25.  To plaintiff, Commerce's choice
"neglects the fact that the subject merchandise under this
review is whole garlic rather than peeled garlic.  The
production process of surrogate companies shall be specific to
the respondent under [the] current review, instead of the 'the
broader experiences of [the] *garlic industry*' in the PRC."
Pl.'s Second Case Br. 17–18.  Plaintiff cites Commerce's
determinations from previous reviews to support its argument.
Specifically, Sea-line references the Thirteenth
Administrative/New Shipper Reviews where "the Department
determined that . . . 'Tata Tea's financial data . . . are more
comparable [to] that of peeled garlic, which comprises an
increasing share of all PRC garlic imports."  Pl.'s Second Case
Brief 17; *see also* Pl.'s First Case Brief 11–12.  Sea-line also
cites the Fourteenth New Shipper Review where "the Department
continued to regard Tata Tea's production processes a[s] more
comparable to that of peeled garlic, which comprises an
increasing share of all PRC garlic imports."  Pl.'s Second Case
Brief 17; *see also* Issues & Dec. Mem. at 10.

Commerce does not directly dispute plaintiff's argument.

Rather, the Department replies that it

> made no determination in the *Final Results* that Tata
> Tea was specifically representative of peeled garlic.
> Instead, Commerce determined that it was preferable to
> use more than one financial statement in its
> calculation and found that financial statements for
> both Limtex and Tata Tea satisfied its standards for
> surrogate financial ratios.

Def.'s Br. 26 (citing Issues & Dec. Mem. at 12).   Thus, Commerce

reiterates that its primary reason for including the Tata Tea

statement was its desire to use more than one financial

statement.   Commerce thus explains its determination by

maintaining that it

> was left with two imperfect scenarios: (1) use
> Limtex's ratios alone, thus losing the benefit of
> information that reflects the 'broader experience of
> the surrogate industry' desired by Commerce; or (2)
> include Tata Tea's ratios to produce an average, even
> though Tata Tea might be less representative of whole
> garlic production than Limtex.

Def.'s Br. 27 (internal citation omitted).

As an initial matter, the court concludes that, should it

ultimately be found that Commerce did not err in relying on Tata

Tea's financial statement, it was reasonable for Commerce to

average the Limtex and Tata Tea financials.   The Department's

threshold decision to use the Tata Tea statement, even though it

contained data for the production of commodities other than tea,

was supported by substantial evidence because Commerce

reasonably explained that the benefit of using more data

outweighs the inclusion of a small amount of other products.
Indeed, both parties have acknowledged that "sales of tea
comprise the vast majority of Tata Tea Group's sales, with sales
of coffee representing less than one quarter of total sales."
Issues & Dec. Mem. at 13.  As to the other commodities listed by
plaintiff (i.e., pepper, cardamom, spices, timber,
veneer/plywood, and mineral water), the record reveals that
these sales were insignificant,[12] when compared to sales of tea.
Therefore, it was reasonable for Commerce to conclude that the
Tata Tea statement largely reflected the production of tea.

     In addition, any negative effect that might result from the
inclusion of coffee production in the financials would be
reduced by the averaging of Tata Tea's and Limtex's financial
data.  As noted, Commerce has a reasonable preference to use
multiple financial statements to eliminate distortions that may
arise from using those of a single producer.  In other words,
Commerce has concluded that a greater number of financial
statements, here two instead of one, will lead to more reliable
data by evening out any abnormalities present in a single
producer's data.  *See Fujian Lianfu Forestry Co. v. United*

---

[12]    While coffee comprised 20.88% of Tata Tea's sales, the
other non-tea commodities cited by plaintiff all composed less
than 0.5% of sales, ranging from 0.02% for cardamom to 0.45% for
mineral water.  Petitioners' Surrogate Data Submission, Ex. 4 at
108, A-570-831 (Jan. 14, 2010) (P.R. Doc. 40).

*States*, 638 F. Supp. 2d 1325, 1353 (2009) ("When averaging multiple financial ratios from several statements, Commerce generally finds that the greatest number of financial statements yields the most representative data from the relevant manufacturing sector, and thus provides the most accurate portrayal of the economic spectrum."). This is what Commerce intended to achieve here; i.e., any distortions resulting from the inclusion of coffee data in Tata Tea's financials would be lessened by averaging the data with Limtex's financials.

As to plaintiff's argument that Commerce failed to choose financial statements from surrogate companies with production processes that most closely reflect those of Sea-line, however, the court finds this issue must be remanded because the Department has not adequately explained its decision to employ financials from Tata Tea that it had previously found to be "more comparable [to] that of peeled garlic." Issues & Dec. Mem. at 9. Pursuant to 19 C.F.R. § 351.408(c)(4), Commerce "normally will use nonproprietary information gathered from producers of *identical or comparable merchandise* in the surrogate country." 19 C.F.R. § 351.408(c)(4) (emphasis added). At no point, however, does Commerce explain how the choice of the Tata Tea financial statement conforms to this regulation. Instead, the Department relies solely on its preference for data from more than one source. *See* Issues & Dec. Mem. at 12 ("[W]e

note that it is the Department's preference to use financial
data from more than one surrogate producer to reflect the
broader experience of the surrogate industry."). This
explanation, however, is not adequate because Commerce appears
to have ignored its own regulation in reaching its
determination. Put another way, the Department's desire to use
more than one source of financial data to avoid distortions
cannot form a reasonable basis for relying on a financial
statement that, as a whole, reflects the production of
merchandise that is not "identical or comparable" to that
exported by Sea-line.

For this reason, and because, as shall be seen in the
discussion of the Garlico financial statement below, there may
be other available information on the record, Commerce's
decision to use the Tata Tea statement must be remanded.


b. Multinational, Consolidated Information

Plaintiff's second objection to Commerce's use of the Tata
Tea statement is that Commerce ignored the directive in Dorbest
that the Department use values from "comparable countries" when
it relied on Tata Tea's consolidated financial statement, which
included information for countries other than India. Defendant
believes that plaintiff waived this argument because it failed
to raise it before Commerce at the administrative level, and

therefore it failed to exhaust its administrative remedies.

Def.'s Br. 22-24 ("Although Sea-line objected in its case brief

to Commerce's use of Tata Tea's consolidated financial

statements, it did not advance any argument concerning the

economic comparability of the countries in which Tata Tea's

subsidiaries, associates, and joint ventures . . . were

located.").

In its First Case Brief,[13] plaintiff's two arguments

regarding the surrogate financial ratios were: (1) that the

"Department Shall Not Use Tata Tea's Financial Ratios Because of

the Department's Previous Decision That Tata Tea's Production

Process Was More Comparable to That of Peeled Garlic"; and (2)

that the "Department Shall Select Garlico Industries Ltd. as

[the] Surrogate Company for Financial Ratios in the Final

Results."  Pl.'s First Case Br. 11, 12.

In its Second Case Brief, plaintiff retained its first

argument as above, but replaced its second argument with "the

Department Shall Not Use Tata Tea Consolidated Accounts for the

Financial Ratios Because the Financial Information Includes

Various Products other than Tea Products."  Pl.'s Second Case

---

[13]    Plaintiff submitted two different case briefs from the
same counsel: one on June 4, 2010 and a subsequent brief on
August 6, 2010.  As neither brief was rejected by the
Department, both were part of the record before Commerce and are
part of the record in this action.

Br. 18.  Because these were the only arguments presented,
Commerce did not address arguments related to "comparable
countries" in the Final Results.

Recognizing that it did not explicitly make an argument
with respect to the inclusion of countries other than India in
the Tata Tea financial statement, plaintiff urges that its
"listing of non-economically comparable countries" in its Second
Case Brief, and its "mentioning Tata Tea was a multinational
conglomerate," amounted to raising the issue, and that the
*Dorbest* decision[14] should have "alert[ed] Commerce — indeed
place[d] an affirmative obligation on Commerce — to scrutinize
the Tata Tea financials."  Pl.'s Reply 11; *see also* Pl.'s Second
Case Br. 18.[15]

---

[14]    In *Dorbest*, the Federal Circuit stated that "the
statute requires the use of data from economically comparable
countries 'to the extent possible.'"  *Dorbest*, 604 F.3d at 1371-
1372 (quoting 19 U.S.C. § 1677b(c)(4)(A)).

[15]    The plaintiff's passing references to the
multinational nature of Tata Tea are embedded in its other
arguments.  Specifically, in its First Case Brief, in its
argument that Tata Tea's production process is more comparable
to that of peeled garlic, rather than whole garlic, plaintiff
states "[t]he company also has large scale and diversified
business.  It has subsidiaries such as Tata Coffee Limited Inc.
in the United States and Mount Everest Mineral Water Ltd. a
subsidiary dealing in mineral water business.  Tata Tea's
business and organizational management is far more advanced and
matured than Sea-line."  Pl.'s First Case Br. 12.  This is the
only reference to Tata Tea's multinational activities.

( continued . . . )

Under 28 U.S.C. § 2637(d), this Court "shall, where

appropriate, require the exhaustion of administrative remedies."

28 U.S.C. § 2637(d); *see also Corus Staal BV v. United States*,

502 F.3d 1370, 1379 (Fed. Cir. 2007) ("[A]bsent a strong

contrary reason, the court should insist that parties exhaust

their remedies before the pertinent administrative agencies.").

Therefore, "[o]rdinarily, when a party fails to make an argument

in proceedings below, the argument is waived." *CEMEX, S.A. v.*

*United States*, 133 F.3d 897, 902 (Fed. Cir. 1998); *see also Sage*

---

( . . . continued )

Similarly, in its Second Case Brief, plaintiff references
Tata Tea's multinational activities in its argument that the
Tata Tea statements are inappropriate because they include
information for non-tea products.  This reference is limited to
the following:

The consolidated financial statement includes
financial information of Tata Tea Limited's
subsidiaries, associates and joint ventures ("Tata Tea
Group").  The Tata Tea Group covers 24 subsidiaries
with voting power between 78.79 – 100% located in nine
countries in the world, including U.S.A., U.K.,
Canada, Australia, Kenya, Malawi, Poland, Czech
Republic and Cyprus.  The Tata Tea Group also includes
15 joint ventures located in 6 overseas countries and
4 associates in 2 overseas countries.

Although the Department stated that it does not
examine "the surrogate company's 'business experience'
(i.e. size, profit, etc.)", the diversified
multinational operation also expands its products far
beyond tea, which was determined by the Department to
be a comparable product of garlic.

Pl.'s  Second Case Br. 18 (internal citations omitted).

*Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997) ("With a few notable exceptions, such as some jurisdictional matters, appellate courts do not consider a party's new theories, lodged first on appeal.").

Here, the court finds that no matter how either of plaintiff's two case briefs is read, there can be no claim that it raised before Commerce the argument that the Tata Tea statement included data from many different, *non-economically comparable countries*, and therefore that argument cannot be considered here.  That is, the mere listing of the countries covered by the Tata Tea statement, combined with the issuance of a decision by the Federal Circuit, cannot be construed as plaintiff having raised an argument that Commerce was bound to address.  Indeed, the

> underlying principle [behind the exhaustion requirement] is that "courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice."  The doctrine of exhaustion thus works to serve two basic purposes: It allows the administrative agency to perform the functions within its area of special competence (to develop the factual record and to apply its expertise), and—at the same time—it promotes judicial efficiency and conserves judicial resources, by affording the agency the opportunity to rectify its own mistakes (and thus to moot controversy and obviate the need for judicial intervention).

*Ta Chen Stainless Steel Pipe, Ltd. v. United States*, 28 CIT 627, 644, 342 F. Supp. 2d 1191, 1206 (2004) (quoting *United States v.*

*L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952)); *see also
Richey v. United States*, 322 F.3d 1317, 1326 (Fed. Cir. 2003)
("Exhaustion . . . serves 'the twin purposes . . . of protecting
administrative agency authority and promoting judicial
efficiency.'" (quoting *Sandvik Steel Co. v. United States*, 164
F.3d 596, 600 (Fed. Cir. 1998))).  Accordingly, the court finds
that because plaintiff failed to raise the issue of "comparable
countries" during the administrative proceedings, and thus
failed to exhaust its administrative remedies, it will not
consider the issue here.

### c. Use of Smaller Subset of Data to More Accurately Represent Garlic-Related Figures

Next, plaintiff contends that "if the Department wanted to
use some Tata Tea data, the Department could have adjusted the
Tata Tea data to represent more accurate garlic related
figures."  Pl.'s Br. 17.  To accomplish this, plaintiff suggests
that "in the alternative to the complete Tata Tea financials, if
the Department continued to believe Tata Tea financials were
appropriate, the Department could use the financial information
of Tata Tea Limited, not the consolidated statements as these
cover Tata Tea's international operations which are not
comparable to Sea-line."  Pl.'s Br. 26.

While plaintiff asserts that "Sea-line made a detailed
calculation of the Tata Tea Limited financials" for Commerce to
consider, Pl.'s Br. 26, the full description of this
alternative, which only appears in plaintiff's Second Case Brief
(not its First Case Brief) was limited to the following:

> For the purpose of comparison, Sea-line used financial
> information of Tata Tea Limited to derive the
> financial ratios.  [The] Table . . . below provides
> the comparison of the financial ratios derived from
> Tata Tea consolidated accounts as submitted by the
> [defendant-intervenors] and the financial ratios
> derived from Tata Tea Limited.

Pl.'s Second Case Br. 19.

The "detailed calculation," however, was confined to a
simple table listing certain values, with no information as to
how Sea-line derived these "limited" values.  Thus, Sea-line
offers a table it claims was derived from Tata Tea Limited's
financials, without revealing what was left out and what was
included in the data.  According to defendant, plaintiff offered
no explanation as to how it constructed its submission.
Defendant notes, moreover, that "Sea-line fails to explain how
its alternative 'Tata Tea Limited' ratio would correct the
alleged defect in Tata Tea's consolidated statement."  Def.'s
Br. 27.  In other words, it was entirely unclear what was backed
out of the complete Tata Tea statement and why.

The court finds that it was reasonable for Commerce to
reject plaintiff's redacted Tata Tea data.  In the absence of

any explanation of how the data in plaintiff's proffered table

was derived (i.e., what was included from the Tata Tea

Consolidated data and what was left out), Commerce reasonably

determined not to rely on it.  Plaintiff provided the table

"[f]or the purpose of comparison."  Pl.'s Second Case Br. 19.

It is apparent, however, that no comparison can be made without

a clear idea of how the table was constructed, and how it

accomplished the purpose of being a more accurate representation

of plaintiff's business than Tata Tea's consolidated statement.

In light of Commerce's reasonable criteria of "consider[ing] the

quality and specificity of the statements," *Dorbest*, 604 F.3d at

1374, it was reasonable for Commerce to conclude that the full

Tata Tea financial statement, as published in its Annual Report,

was more reliable than the subset extracted by plaintiff.

For these reasons, the court finds that Sea-line has not

demonstrated that its submission was the "best available

information" on the record, and therefore Commerce's decision to

reject it was reasonable and supported by substantial evidence.


2. Use of the Garlico Statement

In addition to its objections to the use of the Tata Tea

statement, plaintiff also argues for the use of the Garlico

statement, stating that the "Garlico financial statements on the

administrative record were more representative of Sea-line's

business during the [new shipper] POR than the financial

statements of Tata Tea."  Pl.'s Br. 26.  According to plaintiff,

this is because Garlico "produces garlic-related products and

engages in garlic production.  It is the most comparable company

for surrogate financial ratios."  Pl.'s First Case Br. 3.

Defendant asserts, however, that "Sea-line . . . waived its

Garlico argument when it failed to raise the argument in its

case brief.  Accordingly, Commerce was under no obligation to

further address the issue."  Def.'s Br. 29.  Defendant-

intervenors also take this position, stating that "the

administrative record makes clear that Sea-line abandoned this

[Garlico] argument during the proceedings before the Commerce

Department" because

> Sea-line's August 6, 2010 case brief contains no
> argumentation urging the Department to rely on the
> Garlico financial statements to calculate surrogate
> financial ratios in the final results.  Thus, the only
> reasonable conclusion is that Sea-line abandoned its
> argument concerning Garlico's financial statements and
> thereby failed to exhaust its administrative remedies
> with the Department.

Def.-Ints.' Br. 18-19 (internal citation omitted).

In its First Case Brief, however, plaintiff did argue that

the "Department Shall Select Garlico Industries Ltd. as

Surrogate Company for Financial Ratios in the Final Results."

Pl.'s First Case Br. 12.  Even though the Department had both

the Garlico's financial statement and this argument before it,

it is apparent that Commerce only addressed the arguments
presented in plaintiff's Second Case Brief, summarized as
follows: "Sea-line contends the Department should not use Tata
Tea's financial ratios for the final results because: 1) in the
past, the Department has found Tata Tea's production process to
be more comparable to that of peeled garlic, and 2) because Tata
Tea's financial ratios include products other than tea."  Issues
& Dec. Mem. at 9.  This is an accurate description of
plaintiff's objections as presented in its Second Case Brief,
*see* Pl.'s Second Case Br. 17–19, but it does not explain why
Commerce did not address the Garlico issue raised in plaintiff's
earlier papers.

    Plaintiff's complete argument regarding Garlico in its
First Case Brief is as follows:

> Sea-line submitted to the Department [the] financial
> ratios of Garlico.  Garlico is a wholesaler dealing
> with various garlic products such as garlic slices,
> garlic flakes, raw garlic, garlic granules and garlic
> pow[d]er.  Because of similar merchandise and business
> between Garlico and Sea-line, Garlico is the most
> comparable surrogate company in the current review.
> The Department shall select Garlico's financial ratios
> as surrogate financial rates.

Pl.'s First Case Brief 12 (internal citation omitted).

    The court holds that because plaintiff's Garlico argument
was raised in its First Case Brief, which Commerce did not
reject, and thus that submission is part of the record, Commerce
was obliged to evaluate the Garlico statement.  Therefore, the

Department should have explained, and supported with substantial evidence, why the Tata Tea and Limtex statements were nonetheless the best available information, taking the Garlico financial statement into account.

While Commerce made a threshold decision to use an average from two tea producers, not from garlic producers such as Garlico, this determination did not relieve Commerce of its responsibility to discuss its decision not to use the Garlico statement. *See Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1355 (Fed. Cir. 2005) ("[I]t is well settled that an agency must explain its action with sufficient clarity to permit 'effective judicial review.'" (quoting *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973))); *see also Dorbest Ltd. v. United States*, 35 CIT __, __, 755 F. Supp. 2d 1291, 1296 (2011) ("At a minimum, in making its data choices, [Commerce] must explain the standards it applied and make a rational connection between the standards and the conclusion." (citing *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984))).


CONCLUSION AND ORDER

Based on the foregoing, it is hereby

ORDERED that plaintiff's motion for judgment on the agency record is GRANTED, in part, and Commerce's Final Results are REMANDED; it is further

ORDERED that Commerce issue, upon remand, a redetermination
that complies in all respects with this Opinion and Order, is
based on determinations that are supported by substantial record
evidence, and is in all respects in accordance with law; it is
further

ORDERED that Commerce, in preparing the Remand
Redetermination, shall fully explain its decision to use the
garlic bulb prices from the older 2007–2008 APMC Bulletin to
value the whole garlic bulb, and fully explain why garlic bulb
size is such an important factor that it justifies using prices
outside of the POR; it is further

ORDERED that Commerce, on remand, is directed to revisit
its use of the Tata Tea financial statement and, if it continues
to use the statement, explain why it constitutes the best
available information, taking into account Commerce's previous
finding that it better reflects the production of peeled garlic,
as distinct from the production of Sea-line's whole garlic
bulbs, and how its use satisfies Commerce's regulation regarding
the use of "information gathered from producers of identical or
comparable merchandise"; it is further

ORDERED that Commerce, in preparing the Remand
Redetermination, shall evaluate the Garlico statement submitted
by plaintiff, and determine if it constitutes the best available
information for use, either by itself or together with the other

financial statements, to calculate the surrogate financial

ratios; it is further

    ORDERED that Commerce file the Remand Results on or before

July 23, 2012; it is further

    ORDERED that Comments to the Remand Results shall be due

thirty (30) days following the filing of the Remand Results; it

is further

    ORDERED that Replies to such Comments shall be due fifteen

(15) days following the filing of the Comments.


                                         /s/ Richard K. Eaton
                                              Richard K. Eaton

Dated:     March 21, 2012
           New York, New York