Slip Op. 13-102

UNITED STATES COURT OF INTERNATIONAL TRADE

—————————————————————
                                    :

QINGDAO SEA-LINE TRADING CO.,   :
LTD.,                                     :
                                    :
            Plaintiff,             :
                                    :
      v.                                :
                                    :
UNITED STATES,                :
                                    :      Before: Richard K. Eaton, Judge
           Defendant,      :
                                    :      Court No. 10-00304
      and                            :
                                    :
FRESH GARLIC PRODUCERS      :
ASSOCIATION, CHRISTOPHER     :
RANCH, LLC, THE GARLIC CO.,    :
VALLEY GARLIC, and VESSEY AND  :
CO., INC.,                        :
                                    :
           Defendant-Intervenors.   :
—————————————————————  :

**OPINION**

[The Department of Commerce's Final Results of Redetermination are sustained.]

Dated: August 8, 2013

      *Robert T. Hume*, Hume & Associates, LLC, of Ojai, CA, argued for plaintiff. With him on the brief was *Li Jasmine Zhao-King*, Trade Bridge, of Elkridge, MD.

      *Richard P. Schroeder*, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, D.C., argued for defendant. With him on the brief were *Stuart F. Delery*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Reginald T. Blades, Jr.*, Assistant Director. Of counsel on the brief was *Whitney M. Rolig*, Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Washington, D.C.

      *John M. Herrmann*, Kelley Drye & Warren, LLP, of Washington, D.C., argued for defendant-intervenors. With him on the brief was *Michael J. Coursey*.

Eaton, Judge:  At issue are the Final Results of Redetermination, made pursuant to a

remand order issued by the court on March 21, 2012, involving the final results of a new shipper

review in connection with the antidumping duty order on fresh garlic from the People's Republic

of China ("PRC") for the period of review ("POR") November 1, 2008 through April 30, 2009.

Final Results of Redetermination Pursuant to Remand (Dep't of Commerce Sept. 6, 2012) (ECF

Dkt. No. 50) ("Remand Results"); *Qingdao Sea-line Trading Co. v. United States*, 36 CIT __,

Slip Op. 12-39 (2012) (*Qingdao I*); Fresh Garlic From the PRC, 75 Fed. Reg. 61,130 (Dep't of

Commerce Oct. 4, 2010) (notice of final results of new shipper review) ("Final Results").

Plaintiff, Qingdao Sea-line Trading Co., Ltd. ("plaintiff" or "Sea-line"), objects to each

of the Department's determinations on remand.  Pl.'s Cmts. on the Remand Results (ECF Dkt.

No. 57) ("Pl.'s Cmts.").  Commerce, however, believes that its "remand results fully comply

with the Court's remand order, are supported by substantial evidence, and should be sustained."

Def.'s Resp. to Pl.'s Cmts. 2 (ECF Dkt. No. 65) ("Def.'s Resp.").  Defendant-intervenors assert

that the court should reject Sea-line's arguments and affirm the Department's Remand Results.

Def.-Ints.' Resp. to Pl.'s Cmts. (ECF Dkt. No. 64) ("Def.-Ints.' Resp.").

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2006) and 19 U.S.C. §

1516a(a)(2)(B)(iii) (2006).

For the reasons set forth below, the Remand Results are sustained.

## BACKGROUND

In 1994, Commerce issued an antidumping order on imports of fresh garlic from the

PRC.  *See* Fresh Garlic from the PRC, 59 Fed. Reg. 59,209 (Dep't of Commerce Nov. 16, 1994)

("the Order").  In 2009, plaintiff, an exporter of fresh, whole garlic bulbs from the PRC,

requested a new shipper review, which the Department initiated in June 2009.  *See* Fresh Garlic

From the PRC, 74 Fed. Reg. 31,241 (Dep't of Commerce June 30, 2009) (notice of initiation of

new shipper review).  After the review was complete, Commerce issued its Final Results in

which it determined plaintiff's antidumping margin to be 155.33% and its per-unit cash deposit

rate to be $1.28 per kilogram.  Final Results, 75 Fed. Reg. at 61,131.  For the Final Results, the

Department used the Azadpur Agricultural Produce Marketing Committee's Market Information

Bulletin ("APMC Bulletin") to value plaintiff's garlic bulbs.  Because plaintiff reported a bulb

size of over fifty-five millimeters, Commerce determined that the subject garlic was "Grade

Super A."  As there were no prices reported in the APMC Bulletin for this grade during the

November 1, 2008 through April 30, 2009 POR, Commerce valued plaintiff's garlic bulbs using

Grade Super A prices from the APMC Bulletin for the period November 1, 2007 through

February 6, 2008.  These prices were then adjusted for inflation using the Wholesale Price Index

for India in the International Monetary Fund's International Financial Statistics.  *Qingdao I*, 36

CIT at__, Slip Op. 12-39, at 9.  In addition, to calculate the surrogate financial ratios, which are

used to value selling, general and administrative expenses, overhead, and profit, the Department

averaged figures from the financial statements of Tata Tea Limited ("Tata Tea") and Limtex Tea

Limited ("Limtex").

     In its motion for judgment on the agency record, Sea-line disputed the Department's use

of the APMC Bulletin from a period before the POR and its use of the Tata Tea financial

statement.  In *Qingdao I*, the court granted plaintiff's motion, in part, and remanded the matter

for Commerce to (1) "fully explain its decision to use the garlic bulb prices from the older 2007–

2008 APMC Bulletin to value the whole garlic bulb, and fully explain why garlic bulb size is

such an important factor that it justifies using prices outside of the POR"; (2) "revisit its use of

the Tata Tea financial statement and, if it continues to use the statement, explain why it

constitutes the best available information, taking into account Commerce's previous finding that

it better reflects the production of peeled garlic, as distinct from the production of Sea-line's

whole garlic bulbs"; and (3) "evaluate the [Garlico Industries Limited ("Garlico")] statement

submitted by plaintiff, and determine if it constitutes the best available information for use, either

by itself or together with the other financial statements, to calculate the surrogate financial

ratios." *Qingdao I*, 36 CIT at__, Slip Op. 12-39, at 47–48.

The Department issued the Draft Remand Results in July 2012 and Sea-line was the only

party to submit comments.  Commerce then filed the final Remand Results in September 2012 in

which

> the Department . . . explained: (1) why specificity (size) is more important than
> contemporaneity when identifying a surrogate value . . . for raw garlic inputs; (2)
> why the [Tata Tea] financial statements reflect the production of comparable
> merchandise and should continue to be used to calculate surrogate financial ratios;
> and (3) why the [Garlico] financial statements do not constitute the best available
> information to calculate surrogate financial ratios.

Remand Results at 1.  Based on this analysis, Commerce concluded "that no changes to the

margin calculated in the Final Results for [Sea-line] are warranted."  Remand Results at 1.

## STANDARD OF REVIEW

"The court shall hold unlawful any determination, finding, or conclusion found . . . to be

unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19

U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.   LEGAL FRAMEWORK

Upon request, Commerce conducts administrative reviews "for new exporters and

producers."  19 U.S.C. § 1675(a)(2)(B).  "The purpose of these new shipper reviews is to

determine whether exporters or producers, whose sales have not previously been examined, are

(1) entitled to their own duty rates under an antidumping order, and (2) if so, to calculate those rates." *Zhengzhou Huachao Indus. Co. v. United States*, 37 CIT __, __, Slip. Op. 13-61, at 5 (2013) (citing *Hebei New Donghua Amino Acid Co. v. United States*, 29 CIT 603, 604, 374 F. Supp. 2d 1333, 1335 (2005)). To calculate the rates, Commerce must determine the normal value, export price,[1] and the antidumping duty margin[2] for each entry of the subject merchandise. 19 U.S.C. § 1675(a)(2)(A).

For merchandise exported from a nonmarket economy ("NME") country,[3] such as the PRC, Commerce usually determines normal value by first pricing the factors of production used to produce the merchandise using surrogate data from "one or more market economy countries that are—(A) at a level of economic development comparable to that of the [NME] country, and (B) significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4)(A)–(B). After valuing the factors of production, the Department then adds an amount, calculated using the "surrogate financial ratios," to account for selling, general and administrative expenses,

---

[1]     The "export price" or U.S. price is defined as "the price at which the subject merchandise is first sold . . . by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States." 19 U.S.C. § 1677a(a).

[2]     An antidumping duty margin is "the amount by which the normal value [i.e., the home market price] exceeds the export price [i.e., the U.S. price] or constructed export price of the subject merchandise." 19 U.S.C. § 1677(35)(A). "If the price of an item in the home market (normal value) is higher than the price for the same item in the United States (export price), the dumping margin comparison produces a positive number, indicating that dumping has occurred." *Qingdao I*, 36 CIT at__, Slip Op. 12-39, at 5.

[3]     A "nonmarket economy country" is "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A). "Because it deems China to be a non-market economy country, Commerce generally considers information on sales in China and financial information obtained from Chinese producers to be unreliable for determining, under 19 U.S.C. § 1677b(a), the normal value of the subject merchandise." *Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT 480, 481, 318 F. Supp. 2d 1339, 1341 (2004).

overhead, and profit.  19 U.S.C. § 1677b(c)(1)(B).  Here, because China is a NME country,

Commerce selected India as the surrogate country for purposes of valuing the factors of

production and calculating the surrogate financial ratios.

While it usually values the individual factors of production to calculate normal value,

following the ninth administrative review for garlic exported from the PRC, Commerce ceased

using this methodology because it found that information about these factors of production in

China were unreliable.  *See Jining Yongjia Trade Co. v. United States*, 34 CIT __, __, Slip Op.

10-134, at 8–11 (Dec. 16, 2010).  As a result, beginning with the tenth administrative review, the

Department determined that, "[i]n order to eliminate the distortions in our calculation of [normal

value] . . . , we have applied an intermediate-product valuation methodology to all companies,"

by which Commerce endeavored to capture the complete costs of producing "fresh garlic" by

valuing the "fresh garlic bulb" as an intermediate product.  *See* Fresh Garlic from the PRC, 71

Fed. Reg. 26,329, 26,331 (Dep't of Commerce May 4, 2006) (final results and partial rescission

of antidumping duty administrative reviews and final results of new shipper reviews).  In other

words, rather than basing normal value on the sum of the surrogate values for the upstream

factors of production reported by respondents, such as costs associated with leasing land,

fertilizer, irrigation, labor, and the like, Commerce assumed that these costs were all contained in

the price of the intermediate product: the whole garlic bulb.

Pursuant to statute, the information used by Commerce to value the factors of production

(or, here, the whole garlic bulbs) must be "the best available information regarding the values of

such factors in a market economy country or countries considered to be appropriate."  19 U.S.C.

§ 1677b(c)(1).  In selecting the best available information for valuing the factors of production,

Commerce's practice is to select surrogate values that "reflect[] a broad market average, [are]

publicly available, contemporaneous with the period of review, specific to the input in question,

and exclusive of taxes on exports." *QVD Food Co. v. United States*, 34 CIT __, __, 721 F. Supp. 2d 1311, 1315 (2010) (citation omitted).

As noted, Commerce adds an amount calculated using "surrogate financial ratios" to the surrogate values of the factors of production (or, as here, to the value of the whole garlic bulb as the intermediate input). 19 U.S.C. § 1677b(c)(1) (Commerce "shall determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise and *to which shall be added an amount for general expenses and profit*." (emphasis added)). The surrogate values used to calculate these ratios are derived from surrogate financial statements. In selecting these statements, Commerce "normally will use nonproprietary information gathered from producers of identical or comparable merchandise in the surrogate country." 19 C.F.R. § 351.408(c)(4) (2010). In doing so, Commerce "narrow[s] the list of financial statements meeting this criterion . . . [by] consider[ing] the quality and specificity of the statements, as well as whether the statements are contemporaneous with the data used to calculate production factors." *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1374 (Fed. Cir. 2010).

## II.   COMMERCE PROPERLY PLACED ADDITIONAL EVIDENCE ON THE RECORD ON REMAND

Because it found that there was insufficient record evidence to comply with the court's remand instructions, the Department placed additional evidence on the record including (1) the 2003 Market Research Report on Fresh Whole Garlic in India ("the Indian Market Report"), (2) the 2007 update to the Indian Market Report ("the Indian Market Update"), and (3) a report by the U.S. Department of Agriculture that includes a detailed analysis of the garlic market ("the USDA Report"). Commerce provided the parties with an opportunity to comment on these documents. Remand Results at 4. In response, Sea-line objected to the Department placing new

documents on the record, but did not offer any substantive comments, while defendant-

intervenors commented that all three reports confirm the importance of garlic bulb size to garlic

pricing.  Remand Results at 4–5.

Plaintiff first objects, as it did before the Department, to "Commerce unilaterally

supplementing the administrative record to respond to the Court order."  Pl.'s Cmts. 6.  That is,

during the remand proceedings plaintiff objected to the Department placing new evidence on the

record and now renews its objection before the court.  Pl.'s Cmts. 6.  To support this objection,

plaintiff states that it has found "no authority for Commerce to amend the record without Court

approval."  Pl.'s Cmts. 6 ("If Commerce has the authority to amend the administrative record

with respect to a segment of the proceeding at <u>any time</u> that segment is within the jurisdiction of

Commerce . . . , then how can a respondent bear the 'burden of creating an adequate record'?").

Relying on case law from this Court and the Federal Circuit, the Department responds

that, "[c]ontrary to Sea-line's contentions, the Department inherently has the authority to place

new information on the record of a remand proceeding unless the remanding court specifically

prohibits it from doing so."  Remand Results at 24–25 (citation omitted).  Furthermore, the

Department notes that, "[a]lthough Commerce may not reopen a proceeding once it is appealed

to the Court, it may do so upon remand."  Def.'s Resp. 7 (citing *Home Prods. Int'l, Inc. v. United

States*, 633 F.3d 1369, 1377 (Fed. Cir. 2011)).  Here, the court did not prohibit the Department

from reopening the record on remand.  Therefore, Commerce believes it was within its authority

to reopen the record.  Remand Results at 25.

In addition, Commerce argues that the new evidence was necessary for the Department to

comply with the court's remand order.  Remand Results at 25 ("[R]eopening the record was

appropriate because the new evidence allows the Department to comply with the Court's remand

by fully explaining its determination with respect to garlic bulb size.").  For these reasons,

Commerce argues that the court should reject Sea-line's argument that the Department acted outside of its authority when it unilaterally amended the record on remand.  Def.'s Resp. 9; Pl.'s Cmts. 6.

The court finds that Commerce acted within its authority when it reopened the record on remand to supplement it with additional evidence to substantiate its findings.  While plaintiff is correct that it is the respondent's "burden to create an accurate record during Commerce's investigation," the Federal Circuit has also stated that "[t]he decision to reopen the record is best left to the agency, in this case Commerce." *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1277–78 (Fed. Cir. 2012) (citing *Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993)); *see also PSC VSMPO-Avisma Corp. v. United States,* 688 F.3d 751, 760 (Fed. Cir. 2012) (quoting *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 543–44 (1978)) ("'Absent constitutional constraints or extremely compelling circumstances' . . . courts will defer to the judgment of an agency regarding the development of the agency record."); *Home Prods.*, 633 F.3d at 1377 n.8 (listing cases where the court has granted Commerce's request for remand so that it could reopen the proceedings).  Therefore, while Commerce may not reopen a record while a case is on appeal, it may do so on remand if, in its discretion, it finds that more information is necessary to comply with the remand instructions, unless the court has prohibited it from doing so.  *See id.* at 1377.  Reopening the record is particularly appropriate when, as here, doing so clearly advances the purposes of the remand.  *See Thai Plastic Bags Indus. Co. v. United States*, 37 CIT __, __, 895 F. Supp. 2d 1337, 1346 (2013) (noting that Commerce has "inherent discretion" to place additional information on the record on remand in order to achieve the purposes of the remand).

Because the evidence placed on the record made it possible for the Department to address the court's remand instructions, plaintiff's objections must be rejected.

### III.   COMMERCE REASONABLY DETERMINED THAT GARLIC BULB SIZE IS A DETERMINATIVE PRICING FACTOR FOR GARLIC

As noted, when determining a value for whole garlic bulbs, Commerce used prices outside of the POR after finding that there were no contemporaneous prices for Grade Super A garlic.  In *Qingdao I*, the court found that the Department had "failed to explain why garlic size (product-specificity) trumps contemporaneousness in its choice of garlic bulb prices."  *Qingdao I*, 36 CIT at__, Slip Op. 12-39, at 11; *id.* at __, Slip Op. 12-39, at 10 ("Although it may be that size is a more important factor than contemporaneity when valuing the whole garlic bulb, here Commerce's decision to use the earlier grade-specific data, rather than the contemporaneous data for a smaller garlic bulb, was not adequately explained.").  Therefore, the court ordered Commerce to "fully explain its decision to use the garlic bulb prices from the older . . . APMC Bulletin to value the whole garlic bulb, and fully explain why garlic bulb size is such an important factor that it justifies using prices outside of the POR."  *Id.* at __, Slip Op. 12-39, at 47.

On remand, in support of its contention that it "has consistently determined that the size of garlic bulb is the most important factor in determining garlic prices" and that the evidence in this review supported the use of non-contemporaneous prices, Commerce examined and discussed the three reports it placed on the record, as well as the APMC data.  Remand Results at 7.  As an initial matter, Commerce noted that it "has relied on these reports in previous administrative proceedings as the basis for concluding that size is the most important factor in determining garlic prices."  Remand Results at 7.  The Department described the Indian Market Report as "an extensive analysis of the garlic industry in India," which "analyzes garlic prices by grade and the corresponding size (grade A (>40 mm, typically 40–55 mm); grade B (30–40 mm); and grade C (<30 mm))."  Remand Results at 7.  Moreover, according to Commerce, the Indian

Market Update "provides clarifications to the Market Research Report [cited in the Remand

Results] . . . regarding Azadpur garlic prices, and includes information regarding Azadpur grade

[Super A] price data." Remand Results at 7. For Commerce, it was particularly noteworthy that

this report "states that, because of the increase in new varieties of large-bulb garlic produced in

India, the grade [Super A] was coined to distinguish between the new varieties and grade A."

Remand Results at 7.

Furthermore, for the Department, "the USDA Report indicates that the market for fresh

garlic pays a premium for large-bulb garlic. Specifically, the report states '[a] cursory

assessment of wholesale prices for garlic suggests that the price per pound rises as bulb size

increases.'" Remand Results at 8 (citation omitted). After reviewing these reports, Commerce

concluded that the reports "show that as the garlic grade (and therefore, the size) rises, the price

also rises." Remand Results at 8. Furthermore, the "same correlation can be noted by looking at

the Azadpur price data on the record for the period November 1, 2007, through February 6,

2008." Remand Results at 8. That is, the APMC data also confirms Commerce's conclusion

that as garlic grade rises, price increases. Therefore, the Department concludes, "[t]hese data

make it clear that the size of garlic in India is an important factor in determining its price."

Remand Results at 8.

In addition to reviewing these reports, Commerce also examined information from Sea-

line regarding its sale of Super A garlic, including its sales negotiation documents. The

Department found that these documents "demonstrate[] that size was the primary characteristic

specified by the customer when purchasing garlic from Sea-line." Remand Results at 8. In

particular, these records indicate that when Sea-line "ordered the garlic from Juxinyuan, the only

product characteristic it specified was the size of garlic it required . . . . Accordingly, the record

indicates that the price Sea-line paid to the processor was based on size, because no other

product characteristics were specified." Remand Results at 9.

    Although it ultimately concludes that, in this case, bulb size is a more important factor for

making a price determination than contemporaneous data, the Department also acknowledges the

importance of contemporaneity, noting that "[w]hen evaluating contemporaneity, the Department

has relied upon the Court's decision in <u>Shakeproof</u> which states that, when all other factors are

equal, contemporaneous data shall be selected over non-contemporaneous data." Remand

Results at 11 (citing *Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United

States*, 30 CIT 1173, 1178–79, Slip Op. 06-129, at 13–14 (2006)). Here, however, "because the

non-contemporaneous grade [Super A] data are more specific to Sea-line's large-bulb raw garlic

input than the contemporaneous grade A data and, all other factors are not equal, the Department

determined that the importance of specificity (<u>i.e.</u>, size) outweighed contemporaneity." Remand

Results at 11.

    Plaintiff disagrees, arguing that "[t]here have been major changes in the record since the

Court made [its] decision [in *Qingdao I*]." Pl.'s Cmts. 9. In particular, plaintiff points out that

additional Azadpur APMC garlic data (i.e., for a greater number of months) has been placed on

the record, as has the new USDA Report. Pl.'s Cmts. 9. This new evidence, plaintiff contends,

"confirms Azadpur APMC garlic prices moved in tandem and contemporaneousness outweighs

size as a barometer of garlic prices." Pl.'s Cmts. 9–10. In other words, plaintiff contends that

the new evidence placed on the record by Commerce demonstrates that garlic prices for the

different bulb sizes all move together through time, and therefore there is a ratio that can be

discerned between the prices for the various bulb sizes. Pl.'s Cmts. 24 ("On the issue of size

versus contemporaneous[ness], the amended record convincingly establishes that garlic prices of

the four sizes identified in the Azadpur APMC Bulletin move together."). From this, plaintiff

concludes that, although "the Azadpur APMC prices for different sizes confirm that prices are

higher for the larger sizes, . . . nothing on the record[] supports the conclusion that size is the

most important factor."  Pl.'s Cmts. 10.  Therefore, plaintiff continues to advocate for the use of

prices from the POR for smaller garlic bulbs adjusted by using a ratio that Sea-line insists exists,

but fails to identify.

Sea-line did prepare two charts based on some of the garlic prices from the APMC

Bulletins "to show the price variations for the different garlic sizes."  Pl.'s Cmts. 12; Pl.'s Cmts

Ex. 8.  The charts, however, do not appear to depict a consistent ratio between the various grades

of garlic.  Nonetheless, plaintiff concludes, without further explanation, that "[f]rom the

historical prices in these charts one can calculate an estimated [Super A] price based on the

relationship between [Super A] grade prices and A grade prices or between [Super A] grade

prices and a composite of grade C-B-A prices."  Pl.'s Cmts. 13.

Defendant responds that "Sea-line has not provided any evidence that contemporaneity

had a bigger influence on prices than size."  Remand Results at 12.  That is, the Department

asserts that there is insufficient evidence to support a finding of a consistent size-to-price ratio

over time.  Remand Results at 28 ("[T]here is simply no evidence on the record demonstrating

that the conditions affecting grade A garlic prices also applied to grade [Super A].  For instance,

an excess supply of smaller bulb garlic in 2008 through 2009 could explain why prices for grades

A, B, and C were lower without a similar drop in [Super A] prices.").  Therefore, Commerce

urges, "[a]lthough it is important that the Department consider the underlying factors that

influence the price of garlic during a specific period, the evidence on the record continues to

weigh in favor of prioritizing size over other considerations."  Remand Results at 29.

The court finds that Commerce has provided a reasonable explanation, supported by

substantial evidence, for preferring garlic bulb size over contemporaneity when determining

sales prices for garlic in this case.  Because the Department did not have contemporaneous prices

for the size of garlic plaintiff exported, it had two choices: (1) Commerce could have used

contemporaneous prices for garlic bulbs smaller than Super A and attempted to adjust the prices

upward to reflect plaintiff's larger-sized garlic bulb, or (2) the Department could have used data

for the Super A bulb size plaintiff actually sold from the previous POR and adjusted the prices

for inflation, as it chose to do.  Here, Commerce reasonably found that the Indian Market Report,

the Indian Market Update, and the USDA Report, which the Department placed on the record to

support its remand findings, all indicate that garlic bulb size is a determinative pricing factor.  In

addition, Sea-line's own sales negotiation documents indicate that plaintiff was most concerned

with the size of the garlic when the sales price was negotiated.  For these reasons, Commerce's

conclusion that, under the facts presented here, "size was the single most important determinant

of price" was reasonable and supported by substantial evidence.  Remand Results at 11.

  In addition, as the court found in *Qingdao I*, plaintiff's argument that a consistent ratio

between the sales prices for different garlic bulb sizes remains speculative.  There is still no

record evidence that the sales prices for the different grades of garlic move consistently together

through time.  Indeed, the charts provided by plaintiff do not illustrate that a consistent ratio

between the prices of the various garlic grades exists as the Super A prices appear to move

independently of the other grades.  *See* Pl.'s Cmts Ex. 8.  Further, plaintiff has not provided any

information regarding how its claimed ratio might be calculated, nor has it calculated this ratio

itself.  On the other hand, the Department has provided a reasonable explanation for why the

prices for garlic of various sizes may not move in tandem over time (e.g., various factors, such as

greater demand for larger garlic bulbs or a surplus of smaller sizes, influence the pricing for the

various grades of garlic bulbs).

Finally, with regard to plaintiff's claim that there is no evidence that size is the *most important factor* in determining price, it should be noted that the court did not ask Commerce to determine whether size in this case is the *most* important factor; rather, the court asked whether garlic bulb size was a more important factor than contemporaneity in this case. *Qingdao I*, 36 CIT at__, Slip Op. 12-39, at 47 ("[I]n preparing the Remand Redetermination, [Commerce] shall fully explain its decision to use the garlic bulb prices from the older . . . APMC Bulletin to value the whole garlic bulb, and fully explain why garlic bulb size is such an important factor that it justifies using prices outside of the POR."). Here, based on the foregoing, the court finds that the Department has convincingly done so.

## IV.   THE DEPARTMENT PROPERLY RELIED ON THE TATA TEA FINANCIAL STATEMENT

In *Qingdao I*, the court found that "the Department has not adequately explained its decision to employ financials [to calculate the surrogate financial ratios] from Tata Tea[4] that it had previously found to be 'more comparable [to] that of peeled garlic'" as distinct from the whole garlic at issue here. *Qingdao I*, 36 CIT at__, Slip Op. 12-39, at 35 (citation omitted). That is, in a previous review, the Department stated that Tata Tea's "production processes are more comparable to that of peeled garlic, which comprises an increasing share of all PRC garlic

---

4       As discussed in *Qingdao I*, Commerce calculated the surrogate financial ratios using financial statements from tea producers, even though the subject merchandise is garlic, because "[s]ince the 2002–2003 administrative review [for garlic], the Department has considered tea processing to be sufficiently similar to garlic processing.  Therefore, Commerce has relied upon the financial statements of tea producers and exporters since that review." *Qingdao I*, 36 CIT at__, Slip Op. 12-39, at 27–28 (internal quotation marks and citation omitted). In addition, "[n]o party objects to the use of surrogate financial statements from tea companies to determine the surrogate financial ratios in this case" and, in fact, "both the plaintiff and defendant-intervenors submitted financial statements from Indian tea companies for Commerce's consideration, and Sea-line conceded tea financials can be appropriate [for calculating the surrogate financial ratios for garlic processing]."  *Id.* at __,  Slip Op. 12-39, at 28 (citation omitted).

imports." Final Results, 75 Fed. Reg. at 61,130, accompanying Issues & Decision Mem. at 10

(citation omitted).  Despite this statement, in the Final Results, the Department used the Tata Tea

financial statements when calculating the surrogate financial ratios to be used in determining the

dumping margin for plaintiff's whole garlic.  Because this use departed from the Department's

prior finding, the court ordered Commerce "to revisit its use of the Tata Tea financial statement

and . . . explain why it constitutes the best available information, taking into account

Commerce's previous finding that it better reflects the production of peeled garlic, as distinct

from the production of Sea-line's whole garlic bulbs." *Qingdao I*, 36 CIT at__, Slip Op. 12-39,

at 47.

On remand, Commerce continues to rely on an average of the data found in the Tata Tea

financial statement, placed on the record by defendant-intervenors, and in the Limtex financial

statement, placed on the record by plaintiff, to arrive at the surrogate financial ratios.[5]  To

address the court's concerns about the Tata Tea statements, Commerce compared the Tata Tea

financial statement on the record in this review to those statements that were on the record for

the 2003–2004 review when the Department found Tata Tea's operation to be more comparable

to that of peeled garlic.  Following this comparison, the Department now finds that its "statement

. . . that Tata Tea's production is more comparable to that of the peeled garlic production process

was based on the Department's analysis of Tata Tea" in the 2003–2004 review.  Remand Results

---

[5]        In *Qingdao I*, the court upheld Commerce's use of the average of two financial
statements, finding that "Commerce has a reasonable preference to use multiple financial
statements to eliminate distortions that may arise from using those of a single producer.  In other
words, Commerce has concluded that a greater number of financial statements, here two instead
of one, will lead to more reliable data by evening out any abnormalities present in a single
producer's data." *Qingdao I*, 36 CIT at__, Slip Op. 12-39, at 33 (citation omitted).  Therefore,
the court held, "[a]s an initial matter, . . . should it ultimately be found that Commerce did not err
in relying on Tata Tea's financial statement, it was reasonable for Commerce to average the
Limtex and Tata Tea financials." *Id.* at __,  Slip Op. 12-39, at 33.

at 15.  Its examination of Tata Tea's financials for 2008–2009, however, resulted in a finding

that the company's production during that period was not "more comparable to the production of

peeled garlic than to the production of whole garlic."  Remand Results at 16.  This conclusion

was largely based on the Department's finding that the 2008–2009 financial statements did not

indicate that Tata Tea's production included a large amount of highly-processed goods, such as

instant tea or tea bags, that would be more comparable to the production of peeled garlic.  The

Department argues that the record supports this conclusion.  *See* Remand Results 13–19.

 For example, according to Commerce, "a review of the Tata Tea Financial Statements

indicates that the majority of the company's production is not of highly-processed merchandise

[such as instant tea or tea bags].  Specifically, . . . the financial statements indicate that during the

2008–2009 period, instant tea sales represented approximately 1.3 percent of total tea sales."

Remand Results at 18.  In other words, "[a]side from the negligible amount of instant tea sales,

the Department's analysis yielded no other information that would indicate that highly-

processed, preserved or value-added tea products [which would be more comparable to peeled

garlic] represent a significant portion of Tata Tea's production."  Remand Results at 18.

Therefore, in contrast to the 2003–2004 financial statements, which "led the Department to

conclude that Tata Tea largely produced highly-processed tea," the 2008–2009 statements "do

not support this conclusion because the statements do not indicate that highly-processed tea

products represent more than a very small portion of Tata Tea's overall tea sales."  Remand

Results at 18.

 Thus, for Commerce, "[b]ecause the Department has previously established that tea is

comparable merchandise (which no party disputes) and no evidence on the record indicates that a

significant portion of Tata Tea's tea production is highly processed or otherwise not comparable

to the production of whole garlic," it has reasonably concluded "that Tata Tea is a producer of

comparable merchandise." Remand Results at 36. Therefore, the Department asserts that it appropriately relied on the Tata Tea financial statements to calculate the financial ratios.

In response, plaintiff argues that the Tata Tea statement is not the best available information on the record primarily because Tata Tea is not a producer of comparable merchandise as it produces green and black tea as well as "branded products." In support of this argument, plaintiff points out that there are photographs of fresh whole bulb and peeled garlic on the record that "confirm that the steps involved in processing whole garlic are relatively labor intensive . . . with the processing of peeled garlic being more capital intensive." Pl.'s Cmts. 14. In addition, plaintiff has supplied a flow chart depicting its production process for whole garlic bulbs as well as descriptions of this process: "After picking, the whole bulbs are cleaned and trimmed, sized, inspected ('culled') and packed." Pl.'s Cmts. 15; Pl.'s' Cmts. 14 ("Juxinyuan withdrew a required amount of fresh garlic from the cold storage. Workers cut off the garlic stems and roots with scissors and knives, and then took off the dirty surface part of the garlic. The processed garlic bulb was put into a big mesh bag that was already placed inside the paper carton on a scale, till the garlic . . . in each carton reached [the desired weight]. Finally the carton was bounded by sealing the plastic strip with the packing machine." (citation omitted)).

Based on this evidence, plaintiff concludes that "[w]hile processing and selling generic green tea may be comparable to processing and selling generic whole garlic, processing and selling 'branded products'[6] or even black tea is not comparable to processing and selling generic (whole) garlic." Pl.'s Cmts. 18. In other words, plaintiff argues that the steps involved

---

[6]     Because there is no definition of "branded products" in the Tata Tea statements or anywhere on the record, plaintiff relies on a definition found on the internet: "We did not find a traditional source for a definition of 'branded products' so we went to the internet and found a definition on the Free Online Dictionary. 'Branded' as an adjective means: '(business/ Marketing) identifiable as being the product of a particular manufacturer or marketing company.'" Pl.'s Cmts. 19 n.39 (citation omitted).

in whole garlic production may be similar to those involved in processing green tea, but are not comparable to the production of branded products, black tea, and highly-processed tea products, such as tea bags.  Therefore, for plaintiff, the Tata Tea financial statements are not the best available information because "Tata Tea continue[s] to be a heavily branded products company with a high [selling, general and administrative expenses] ratio."  Pl.'s Cmts. 20–21.

In response, the Department acknowledges that "instant tea is a highly-processed product," which would make it incomparable to whole garlic, but Commerce specifically found on remand that the production of instant tea "represents a small portion of Tata Tea's total tea production."  Remand Results at 35.  As to plaintiff's arguments regarding black and green tea processing, Commerce points out that, despite having the opportunity to do so, Sea-line did not raise these arguments before the Department, nor before the court in the previous segment of this litigation.  Def.'s Resp. 21.

As to plaintiff's argument that Tata Tea's production of "branded products" makes it incomparable to the production of whole garlic, Commerce counters that "[n]owhere is there any additional description of Tata Tea's branded products or an explanation that would support a finding that branded products are somehow more similar to peeled garlic."  Remand Results at 34–35.  In addition, "there is no evidence that 'branded products' are inherently more highly processed or preserved than tea that is comparable to whole garlic."  Def.'s Resp. 22 ("Commerce determined that the 2008–2009 financial statements do not have 'any description of Tata Tea's branded products or an explanation that would support a finding that branded products are somehow more similar to peeled garlic.'" (citation omitted)).

Sea-line's objections to the use of the Tata Tea financial statements are unconvincing. Plaintiff appears to be arguing that branded products require more processing, making them more capital-intensive than non-branded products, and thus not comparable to the production of fresh

whole garlic bulbs.  Plaintiff, however, has not proved its case.  First, its reliance on evidence of

how whole garlic is processed, including the flow chart, does not undermine Commerce's

conclusions that the Tata Tea financial statements reflect the best available information for

calculating the financial ratios.  Commerce has shown that the 2008–2009 financial statements

differ from those from the 2003–2004 review, and that in the financials pertinent to this review,

only a small amount of Tata Tea's production involves highly-processed products that the

Department concluded in the earlier review were more comparable to peeled garlic.  Remand

Results at 46 ("[T]he Department [found] that nearly 80 percent of the merchandise sold by Tata

Tea is comparable merchandise [because it is not highly-processed].").  In other words, the

Department has shown on remand that the production of instant tea and other highly-processed

products, products that would arguably be more capital-intensive, "represents a small portion of

Tata Tea's total tea production."  Remand Results at 35.  Thus, an analysis of Tata Tea's

financials indicates that they represent the production of merchandise comparable to whole

garlic.

Next, Sea-line did not raise its arguments regarding the differences in processing black

versus green tea before the Department and has thus failed to exhaust its administrative remedies

with regard to this issue.  *Dorbest*, 604 F.3d at 1375 ("[P]arties are 'procedurally required to

raise the[ir] issue before Commerce at the time Commerce [is] addressing the issue.'" (quoting

*Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1383 (Fed. Cir. 2008)).  Moreover,

the significance of this discussion is entirely unclear, particularly since plaintiff itself states that

the evidence regarding whole garlic processing "confirm[s] that the steps involved in processing

whole garlic are relatively labor intensive."  Pl.'s Cmts. 14.  Although plaintiff suggests that

whole garlic processing is more labor intensive (and less capital intensive) than peeled garlic

processing, it fails to cite record evidence establishing this assertion as a fact or tying this

assertion to the production processes of various kinds of tea products.  Thus, while plaintiff

asserts that the processing of whole garlic is somehow different from Tata Tea's processing of

black tea and branded products, Sea-line fails to cite to record evidence as to how these

production processes differ or why such differences matter in this case.

     As to its arguments regarding "branded products," there is no evidence that indicates

whether or not the production of branded products is more comparable to whole or peeled garlic

production, nor is there any indication as to what "branded products" means in the context of

Tata Tea's financial statements.  Indeed, it is difficult to see how placing a particular brand name

on a product's package could materially alter the cost of production of that product.  Further,

because there is no record evidence indicating the volume of branded products produced by Tata

Tea, plaintiff can point to no evidence tending to substantiate its claim that "Tata Tea continue[s]

to be a heavily branded products company."  Pl.'s Cmts. 20–21.

     For these reasons, Commerce has adequately explained why it was appropriate to use

Tata Tea's 2008–2009 financial statement and plaintiff's objections to the use of the Tata Tea

statements cannot be credited.

## V.   COMMERCE PROPERLY CONCLUDED THAT THE GARLICO FINANCIAL STATEMENT WAS NOT THE BEST AVAILABLE INFORMATION

     Finally, in *Qingdao I*, the court faulted Commerce for failing to consider adequately its

decision not to use the Garlico financial statement in its calculation of the surrogate financial

ratios.  *Qingdao I*, 36 CIT at__, Slip Op. 12-39, at 45–46 ("[T]he Department should have

explained . . . why the Tata Tea and Limtex statements were . . . the best available information,

taking the Garlico financial statement into account.").  Therefore, the court ordered Commerce to

"evaluate the Garlico statement submitted by plaintiff, and determine if it constitutes the best

available information for use, either by itself or together with the other financial statements, to

calculate the surrogate financial ratios."  *Id.* at__, Slip Op. 12-39, at 47–48.

On remand, the Department analyzed the Garlico financial statements and found that they

"are publicly available and contemporaneous; however, a review of the financial statements also

reveals that they are not reflective of comparable merchandise and that they contain material

discrepancies and inaccuracies."  Remand Results at 19–20 (outlining a number of errors in the

Garlico statements); Def.'s Resp. 24 ("Commerce noted two faults: the financial statements did

not reflect the production of comparable merchandise and contained material discrepancies.").

For this reason, the Department once again rejected the Garlico financial statements because they

"are lacking in both the quality and reliability of audited financial statements which the

Department generally seeks."  Remand Results at 20.

First, the Department found that Garlico did not produce comparable merchandise:

"[w]hereas Sea-line processed and exported fresh whole garlic, the Garlico Financial Statements

indicate the company is primarily focused on producing highly-processed, non-fresh garlic (and

other vegetable-based) products."  Remand Results at 21.  Indeed, "[w]hile the Garlico Financial

Statements demonstrate that the company traded some raw vegetables (raw garlic, raw onion,

etc.), approximately *91 percent* of the company's sales were non-fresh vegetable products

produced through extensive drying and processing procedures (i.e., dehydrated, kibbled, sliced,

flaked, powdered)."  Remand Results at 21 (emphasis added).  Relying on the scope of the

Order, Commerce argues that "garlic that has been subjected to only minimal amounts of

preparation would be identical or comparable merchandise, while garlic that has been more

highly processed would not be considered identical or comparable merchandise."  Remand

Results at 44.  Indeed, the scope of the Order specifies that subject merchandise is "all grades of

garlic, whole or separated into constituent cloves, whether or not peeled, fresh, chilled, frozen,

provisionally preserved, or packed in water or other neutral substance, *but not prepared or preserved by the addition of other ingredients or heat processing*." Final Results, 75 Fed. Reg. at 61,130 (emphasis added). Thus, according to Commerce, the Order covers garlic that has not been highly-processed. Therefore, because "91.1 percent of all of Garlico's sales during the 2008–2009 period were of vegetable products that have been dehydrated and kibbled as well as turned into slices, flakes, granules, and powders," according to the Department, Garlico cannot be said to be a producer of comparable merchandise. Remand Results at 44.

Second, as to the errors in the financial statements, "the Department found that while the 2008 garlic and onion trading activity purchases and sales are correctly carried through the Garlico Financial Statements, the 2009 garlic and onion trading activity sales are incorrectly reported in Schedules XVI and XVIII." Remand Results at 42. For this reason, "the values reported in Schedules XVI and XVIII as the cost of sales and cost of raw goods sold, respectively, are incorrect." Remand Results at 42. In other words, the Department found "that the underlying figures in the schedules in the Garlico Financial Statements are apparently inaccurately recorded." Remand Results at 42 ("[W]hile the existing addition and linkages in Schedules XVI and XVIII as well as well the Profit and Loss Account may be correct, they are only correct to the extent that the numbers used in them are correct; if the numbers are inaccurate, as the Department has concluded, then the schedules and accounts are also inaccurate."). Therefore, because it found that there were inaccuracies in the underlying figures used in Garlico's financial schedules, Commerce argues that there is an additional reason for concluding that the Garlico financial statement was not the best available information on the record.

In response to Commerce's finding that Garlico's production process is not comparable to that of Sea-line, plaintiff claims that "Garlico is a producer of garlic and other products that

are 'identical or comparable' to the whole garlic processed and sold by Sea-line."  Pl.'s Cmts. 25.

Put another way, plaintiff believes that Garlico's production process is comparable to Sea-line's

because Garlico and plaintiff both deal in garlic.  Plaintiff also disputes the Department's

assertion that the Garlico statement contains errors, stating that "[w]hile Commerce may

question Garlico's financial statement, we find no material errors that would affect using the

Garlico financial statement for financial ratios."  Pl.'s Cmts. 23.  In addition, plaintiff claims that

the errors the Department found were not mistakes, rather they were attributable to differences in

accounting systems.  Pl.'s Cmts. 24("The real issue is whether Garlico is 'comparable' or

whether its accounting system is one that Commerce agrees with.").

        Regarding the errors in the Garlico's statement, defendant counters that "Sea-line has

only shown that the figures included in the schedules are correctly traceable through the profit

and loss statement; it has not responded to the Department's finding that the underlying figures

in the schedules in the Garlico Financial Statements are apparently inaccurately recorded."

Remand Results at 42.  Thus, while the addition and linkages in the financial schedules and the

Profit and Loss Account may be accurate, "they are only correct to the extent that the numbers

used in them are correct; if the numbers are inaccurate, as the Department has concluded, then

the schedules and accounts are also inaccurate."  Remand Results at 42.  Furthermore, "[t]his is

not just a matter of Commerce preferring a different accounting method, as Sea-line supposes; it

is an obvious discrepancy in Garlico's record keeping that results in the company using

purchases to calculate total purchases in one year but using sales to calculate total purchases in

the next."  Def.'s Resp. 26.

        The court finds that plaintiff's arguments for the use of the Garlico financial statement

are unconvincing.  First, Garlico is not more comparable to plaintiff simply by virtue of having

"garlic" in its name.  After examining the Garlico financial statement, the Department found that

91.1% of its products were not comparable to Sea-line's garlic because these products were

highly processed.

In addition, plaintiff has failed to rebut the Department's finding that the Garlico

financial statement is not the best available information to use for the surrogate financial ratios

because it contains errors.  There are discrepancies in the underlying numbers used in the

accounting schedules, and these errors are not attributable to accounting system differences.

Specifically, in the Garlico statements, the trading-related purchases and sales are treated

differently from one year to the next with sales values representing purchases in one year, but

purchase values representing purchases in the following year.  Remand Results at 42.

Furthermore, Sea-line has not pointed to any evidence that the accounting system used (Indian

GAAP) would require a company to rely on the underlying figures in this fashion, nor has it

given any reason why the company would alter the way it recorded purchases and sales from one

year to the next.  Therefore, it was within Commerce's discretion to reject the Garlico statement,

particularly because the Department had higher quality statements on the record (i.e., those of

Limtex and Tata Tea).  *See Dorbest*, 604 F.3d at 1374 (Commerce "narrow[s] the list of financial

statements meeting [the 'identical or comparable merchandise'] criterion [by] consider[ing] the

quality and specificity of the statements, as well as whether the statements are contemporaneous

with the data used to calculate production factors.").  Hence, Commerce properly evaluated the

Garlico statement and reasonably determined that it did not constitute the best available

information for use in calculating the surrogate financial ratios.

**CONCLUSION**

Based on the foregoing, it is hereby

ORDERED that the Department of Commerce's Final Results of Redetermination are

SUSTAINED.


                                                    /s/ Richard K. Eaton
                                                    Richard K. Eaton

Dated:  August 8, 2013
         New York, New York